TRUSTEES OF THE BISHOP'S FUND *against* RIDER:

IN ERROR.

A contract within the constitution of the *United States, art.* 1. *s.* 10. is one relating to property or some object of value, which imposes an obligation, capable, in legal contemplation, of being impaired.

A legislative act equivalent to a contract, which is perfected, requiring nothing further to be done in order to its entire completion, is a contract executed; and whatever rights are thereby created, a subsequent legislature cannot impair.

A legislative act in the nature of an executory contract, which is supported by a sufficient consideration, creates an obligation which a subsequent legislature cannot impair.

But a legislative act importing a contract executory, which depends upon the further action of the legislature or its agents for its execution, and which is without any consideration in fact or in law, may, before its execution and the existence of any consideration, be repealed; such a contract not imposing any obligation legally capable of being impaired.

In 1816, the legislature of this state passed an act, the 1st section of which authorized the agents of the state to settle and obtain the balance due the state from the *United States,* for advancements made by the state for the general defence, during the late war; the 2nd section declared, that such balance, when received, should be, and the same was thereby appropriated for the support of religion and literature in the state, in the manner prescribed in the act; another section appropriated one seventh part of what should be received, for the use and benefit of the *Episcopal* denomination of *Christians,* and authorized the *Trustees of the Bishop's Fund* to receive and hold the same for the benefit of that fund; and the last section declared, that the unappropriated balance, when received, should be and remain in the treasury of the state. In *April,* 1817, the *Trustees of the Bishop's Fund* accepted this appropriation, and shortly afterwards, received 8,785 dollars, as their just proportion under the act. In 1833, the legislature passed an act, refunding to the people of this state such moneys as should be received, by this state, from the *United States,* for advancements made during the late war; and in 1838, it was enacted, that the sum of 35,000 dollars should be retained out of any moneys coming to the state from the *United States,* to meet the debts and current expenses of the state. In *July,* 1838, the treasurer of the state received from the *United States,* through the agent in behalf of the state, 55,923 dollars, on account of such advancements. On an application by the *Trustees of the Bishop's Fund,* for a *mandamus* to the state treasurer, requiring him to pay over to them one seventh part of the moneys last received, a special demand having been made, it was held, 1. That the act of 1816 did not constitute a grant or contract executed; but if, in any sense, a contract, it was a contract executory, to be performed in future, requiring many acts to be done by the state, to complete it, and to accomplish the object contemplated by it: 2. That such executory contract must be supported by sufficient consideration, without which it would confer no rights, and create no corresponding obligations legally capable of being im-

*Hartford,*
June, 1839.

Trustees of the
Bishop's Fund
*v.*
Rider.

paired : 3. That this act does not itself import to have been made upon any sufficient consideration ; nor does it appear that there was, in fact, any such consideration ; nor is such consideration implied from the foim of the contract, it being a public record; nor from the object to which the moneys, when received, were to be applied ; nor from the obligation of the donees to apply them to the purposes for which they were appropriated : 4. That consequently, the act of 1816 conferred no rights on the donees named in it, which a subsequent legislature could not controul ; and the acts of 1833 and 1838, were not repugnant to the constitution of the *United States*, as laws impairing the obligation of a contract.

THIS was a petition for a *mandamus* to *Hiram Rider*, esq., treasurer of the state of *Connecticut*, requiring him to pay over to the petitioners one seventh part of certain moneys received by him in his official capacity.

The petition stated, that by a certain statute law of this state, passed in *October*, 1816, entitled " An Act for the support of Literature and Religion," it was, among other things, provided, that the balance then due to this state from the *United States*, on account of advancements made by this state for the general defence, during the then late war, when received, should be, and the same thereby was, appropriated for the support of religion and literature in this state ; and that one seventh part of what should be received on account of such balance was thereby appropriated for the use and benefit of the *Episcopal* denomination of *Christians* in this state ; and the petitioners were, by said act, authorized to receive and hold the same for the support of a bishop: that on the 7th of *April*, 1817, the petitioners assented to and accepted said grant or appropriation ; and shortly afterwards, received from this state certain sums of money, amounting to the sum of 8,785 dollars, 71 cents, as their just proportion under said statute : that on the 25th of *July*, 1838, the sum of 62,923 dollars, 79 cents, was received, on account of said balance so due to this state from the *United States*, by the respondent, as treasurer of this state, which sum now remains in his hands and custody ; of which sum, so received, the petitioners are, by virtue of said statute, entitled to receive and hold, for the benefit of said fund, one seventh part: that by a certain other act of the General Assembly, entitled " An Act refunding to the people of this state money collected during the war," passed in *May*, 1833, it was enacted, that whenever the moneys, or any part thereof, advanced by the state, for the defence thereof,

during the late war with *Great-Britain*, should be received from the *United States*, it should be the duty of the treasurer of this state, in such form as he might prescribe, to give notice thereof to the several towns in this state ; and said moneys, when so received, should be and were thereby refunded to the people of this state : that by a further act of the General Assembly of this state, passed in *May*, 1838, entitled " An Act to provide means to pay the expenses of the State," it was enacted, that the sum of 35,000 dollars should be retained out of any moneys coming to the state from the government of the *United States*, to be used to meet the debts and the current expenses of the state : and that the respondent, although thereto requested, on the 25th of *July*, 1838, hath at all times refused and neglected, and still doth refuse and neglect, to pay the petitioners said one seventh part of said sum so by him received, or any part thereof ; and the petitioners have reason to believe and fear, that he intends, and without the interposition of this court, will apply the same, or a large part thereof, to the payment of the debts and expenses of the state, or cause the same to be distributed among the towns of this state ; in either of which events, the petitioners will, as they fear, sustain much loss and inconvenience.

The superior court issued a *mandamus* to the respondent in the alternative, requiring him either to pay over to the petitioners one seventh part of said moneys so by him received, or to show cause to the contrary thereof. The respondent, in his answer, set forth the acts of *October*, 1816, *May*, 1833, and *May*, 1838, referred to in the petition, and then averred, that he, as treasurer of the state, did, on the 25th of *July*, 1838, receive from the hands of *Samuel Ingham*, agent in behalf of the state, the sum of 55,923 dollars, 79 cents, the same having been, by said *Ingham*, received from the *United States* on account of advancements made by this state during the war ; that on the same day, by virtue of said act of *May*, 1838, in discharge of his duties as treasurer, he paid out of the same, the sum of 35,000 dollars, to meet and extinguish the debts and current expenses of the state ; that of the residue left in his hands as treasurer, he had, before the service of said petition, under the act of *May*, 1833, divided and paid out to certain towns in this state, the sum of 12,339 dollars, 1 cent ; and that the remaining 8,584 dollars, 78 cents, is now in his hands,

*Hartford,*
June, 1839.
—————
Trustees of the
Bishop's Fund
*v.*
Rider.

*Hartford,*
*June, 1839.*

*Trustees of the*
*Bishop's Fund*
*v.*
*Rider.*

as treasurer, subject to be called for, by certain other towns in this state, which, under said last-mentioned act, are entitled to receive the same.

The court found the facts stated in the return to be true. The court also found, that previous to the issuing of the alternative *mandamus, viz.* on the 27th of *July,* 1838, the petitioners made a demand of the respondent to pay them one seventh part of the moneys so received by him, which he refused to do, or to pay any part thereof; and that on the 3rd of *April,* 1817, the then treasurer of the state paid to the petitioners the sum of 7,142 dollars, 25 cents; and on the 28th of *February,* 1818, the further sum of 1,642 dollars, 86 cents, being the one seventh part of the sums, which, at those times respectively, had been received by the state from the *United States,* on account of said balance due to this state.

Upon these facts the court adjudged, that the petitioners were not by law entitled to have a peremptory *mandamus* issued against the respondent, and dismissed the application.

By motion in error, the petitioners thereupon brought the record before this court for revision.

*Hungerford* and *Toucey,* for the plaintiffs in error, contended, 1. That this is a grant. The right and title vested immediately. The state had the right and title in a part, and made itself trustee of the residue until the money was received. No further act of the legislative power was necessary. It does not differ from any other grant of money payable immediately. It is not an agreement to appropriate the money to the grantees at some future time; but it is a present appropriation, expressed in as strong language as could be used for that purpose. If this ground is tenable, it will not be denied that the rescinding act is unconstitutional and void.

2. That if it be not a present grant, but an executory contract, it is still protected by the federal constitution. A grant is protected only because it is in execution of a contract, the obligation of which remains. All contracts, executed and executory, whether made by a state or an individual, are protected; and no law can repeal them, or impair their obligation.

3. That no consideration, in fact, was necessary to sustain the right under the grant or the contract. Had it not been repealed, the court would now enforce it, without question, by a

writ of *mandamus* to the ministerial offcer who should disregard it.   A legislative act is one of greater deliberation than a bond or other instrument under seal, in regard to which the law conclusively implies a consideration.   It is not upon a footing with a parol contract ; but is an act of as high and unimpeachable character as a record.   It is indeed a record of the first and highest class.   If the contract can be repealed, a grant, which is the execution of such a contract, can, for the same reason, be rescinded.   If an individual had, by a bond, or by a matter of record, come under such an obligation, the whole legislative power of a state could not deliver him from it, or impair it.

*Hartford, June, 1839.*

Trustees of the Bishop's Fund
*v.*
Rider.

4. That there was, in fact, a good and valuable consideration for the grant or contract.   The trustees were to receive, hold, manage, take care of and appropriate this fund for the support of religion, and for the use and benefit of a class of *Christians*.   They have accepted the grant, received a part of the fund, and assumed the obligation.   They have come under responsibilities ; and a large class of men have been, for years, disposing of their property upon the faith of this contract with the state.   The money itself was their share contributed by them to the public defence, and was dedicated, with their consent, when it should be refunded, to the object most dear to them ; and now, when a new generation has come upon the stage, who contributed nothing, the attempt is made to divert it.

*W. W. Ellsworth*, contra, contended, 1. That the act of 1816 is not a gift of any specific thing, either executed or executory, but a mere direction to pay over money, *when received.* The act merely directs the agent of the state to adjust the claim ; to receive the money and put it into the treasury ; and after this has been done, to pay out of the treasury, not anything specifically, but a certain sum of money.   All that is intended or done, by the act, is, to provide, that when the money is received, it shall be distributed.   It is to be received, *by the state*, from the *United States ;* and is then, *in futuro,* to be paid out, by the officer or agent of the state.   Now, were this the case of an individual, who had made a declaration like this, neither law nor equity would enforce it, even without any repealing or countermanding act or declaration.   A court

*Hartford,*
June, 1839.
—————
Trustees of the
Bishop's Fund
*v.*
Rider.

of equity will not enforce a voluntary contract; nor will a court of law give damages for the non-performance of it. *Edwards* v. *Jones,* 7 *Sim.* 325.

2. That the authority of the agent of this state to receive the money, and of the treasurer to pay it out, is revocable, by the legislature, even if there was, under the act of 1816, a vested interest in the specific thing, executed or executory. A power is revocable where there is not an interest in the thing itself, but only in the execution. *Hunt* v. *Rousmanier's* admrs. 8 *Wheat.* 174. *Mansfield* v. *Mansfield* & al. 6 *Conn. Rep.* 559. 565. *Lepard* v. *Vernon,* 2 *Ves. & Bea.* 51.

3. That the General Assembly having revoked the power, the defendant never received the money as *trustee,* but as treasurer of the state. He does not hold it under the act of 1816; but the *state* holds it, by its proper officer.

4. That the money had been chiefly paid away, before a demand was made of the defendant.

5. That this is substantially a suit against the state of *Connecticut;* a claim against the government for money. But no action at law, or in equity, and no mandatory order will lie in favour of any individual against the state. *Chisholm's* exr. v. *Georgia,* 2 *Dal.* 419. 480. n. *Const. U. S. Amend. art.* 11. The remedy is not here, but by petition to the General Assembly.

HUNTINGTON, J. The plaintiffs insist, that the act of 1816 is a *contract* within the meaning of that clause of the constitution of the *United States,* which declares, that no state shall pass a law impairing the obligation of contracts : that it is a contract executed—a grant, perfect and complete in itself, and which has been accepted by the plaintiffs ; or that it is a valid executory contract, supported by a sufficient consideration ; or, from the character of the contracting parties and the form and object of the contract, is obligatory without any consideration in fact. From these premises the inference is drawn, that the acts of 1833, one repealing that of 1816, and the other appropriating the whole sum to be received from the *United States,* to the several towns in the state, and the act of 1838, directing 35,000 dollars of this sum to be retained and used to meet the debts and current expenses of the state, are within the prohibitory clause of the constitution, and therefore

void.   In support of these views, several cases have been cited, *Hartford,*<br>June, 1839. decided by the supreme court of the *United States*, by this court, and the courts of other states in the *Union*, which, it is Trustees of the<br>Bishop's Fund<br>*v.*<br>Rider. supposed, sustain the plaintiffs' claim.

This court have adopted and uniformly upheld the sound doctrine, that the decisions of the supreme court of the *United States*, upon all questions arising upon the construction and powers of the constitution, must controul the state courts, and be absolutely binding on all the tribunals of the *Union*. *Hemstead* v. *Reed*, 6 *Conn. Rep.* 480.   *Norton* v. *Cook*, 9 *Conn. Rep*. 314.   A departure from this rule would produce great confusion, mischief and injustice.   We shall adhere to it, in the present case.

This court have also never failed, on all proper occasions, to assert and maintain the equally sound doctrine, that it is within their well established powers, and a part of their duties, to disregard a legislative act, which is clearly repugnant to the constitution of the *United States*, or of this state.   *Atwater* v. *Woodbridge*, 6 *Conn. Rep.* 223.   *Osborne* v. *Humphrey*, 7 *Conn. Rep.* 336.   *Landon* v. *Litchfield*, 11 *Conn. Rep.* 251.   *Derby Turnpike Co.* v. *Parks*, 11 *Conn. Rep.* 522. To refuse the exercise of this high prerogative, in such cases, would be a gross dereliction of duty, and put the supreme law of the state or nation, under the controul of the legislature.

In the result to which we have come, in the case before us, we have not intended to impair the authority of the decisions which sustain these views of our rights and duties.

The clause in the constitution now under consideration, contains an express prohibition of the exercise of legislative power to effect certain specified objects.   It operates directly upon the states, in reference to their legislative functions, and inhibits them from passing any bill of attainder, *ex post facto* law, or law impairing the obligation of contracts.   It is the mandate of the supreme power, addressed to the states, commanding them to abstain from the performance of certain acts, and thus far expressly limiting the general power of legislation.   One of the acts prohibited, is the enactment of a law impairing the obligation of a contract.   The language is general, and applies to all contracts, which respect property or some object of value, and confer rights which may be asserted in a court of justice.   When the constitution was formed, the term

*Hartford,*
June, 1839.
───────────
Trustees of the
Bishop's Fund
*v.*
Rider.

*contract* had a known legal meaning, as definite and as well understood as a bill of attainder or an *ex post facto* law. This meaning was adopted, and became a part of the instrument, as fully as if it had been expressed in words. The common law had defined the term. It had declared a contract to be a compact between two or more parties; and whether it related to real or personal estate, or was executed or executory, or rested in parol or was under seal, the constitution preserved it inviolate from the action of a state legislature, so far as it created rights or contained obligations binding on the parties in law or equity. The character of the parties to the compact, was not intended to prevent the general application of the prohibition. Whether a state, a minor municipal corporation, a private corporation, or an individual is a party, is not material. All are embraced in the same provision. The rights and duties of the contracting parties, whoever they may be, are determined by the contract, and are protected from legislative interference and controul.

The constitution does not, however, give validity to contracts, which confer no rights; nor does it add to those which they do confer. It prohibits a state from impairing the *obligation* of the contract—that is, the rights and duties which arise from it. It does not declare, that every contract contains an obligation, or that it shall always be enforced; but it does declare, that whatever obligations are created or rights secured, shall not be impaired, by the act of the legislature: thus leaving the questions, as to the nature, form, extent, construction and validity of the contract and the manner of enforcing it, to be determined by the judicial department of the government, and only prohibiting the legislature from passing a law which shall impair the obligations or rights created by it.

It is obvious, therefore, that in every case where the prohibition is attempted to be applied, the first inquiry is, whether the case be one in which the subject matter is a contract relating to property or some object of value, and which imposes an obligation, capable, in legal contemplation, of being impaired? If it be such a contract, the remaining inquiry is, whether the act of the legislature impairs that obligation? Hence, it is a proper subject of examination, whether the contract be executed, or executory? And if the latter, whether it be upon sufficient consideration, proved or presumed? If it be an act

of the legislature which constitutes the contract, is it executed? *Hartford,* June, 1839.
Has the object of the contract been performed? Or, is it a
mere executory contract, requiring the further action of the Trustees of the Bishop's Fund
legislature or its agents, to complete its execution? And if the *v.* Rider.
latter, is it voluntary, or upon sufficient consideration? If the
contract be one which the legislature has the constitutional
power to make, and it be executed, and no further act re-
mains to be done, by the state or its agents—as if a grant of
money be made and the money be delivered, or of land, and
the legislative act is itself the conveyance, not requiring the
execution and delivery of a deed or other instrument, nor any
other act to be done to complete it—the contract has passed
into the form of a grant, it has become a contract executed,
and the law in which it originates, cannot be repealed. But if
the contract be executory, as if it be a gift of money or land
unexecuted, requiring some further act to its completion, as
the delivery of the money, or the execution of an instrument
of conveyance, and is without consideration in fact or pre-
sumed, then before its completion and the existence of any
consideration, it may be repudiated, the gift may be withheld,
and the party who made the promise may revoke it. In this
respect, the state and an individual are subject to the same rule.
It is essential to the validity of a gift, that there be a delivery
of the thing given, or that which is equivalent to it. *Donatio
perficitur, possessione accipientis.* A mere promise to give,
is no gift; and such a promise is equally nugatory, whether
made by a state or an individual.

Our views of the true meaning of this clause of the consti-
tution, may, therefore, be stated summarily as follows. The
body upon which the prohibition rests, is the legislative de-
partment of the state. The subject of the prohibition is every
contract relating to property or some object of value, and which
confers rights which may be asserted in a court of justice. It
is immaterial whether the contract be one between a state and
an individual, or between individuals only; the contracting
parties, whoever they may be, stand, in this respect, upon the
same ground. The obligations imposed and the rights ac-
quired, by virtue of the contract, cannot be impaired, by a le-
gislative act. A law which discharges these obligations or
abrogates these rights, impairs them. A constitutional act of
legislation, which is equivalent to a contract, and is perfected,

*Hartford,*
June, 1839.
—————
Trustees of the
Bishop's Fund
*v.*
Rider.

requiring nothing further to be done in order to its entire completion and execution, is a contract *executed ;* and whatever rights are thereby created, a subsequent legislature cannot impair. The obligation created by a constitutional law, which is in the nature of an executory contract, and is supported by a sufficient consideration, cannot be annulled, at the pleasure of the legislature. A statute enacted by a legislative body, having authority, under the constitution, to enact it, which implies a contract executory, depending upon the further action of the legislature or its agents, for its execution, and which is without any consideration in fact or law, may, before its execution and the existence of any consideration, be repealed ; such a contract not creating any rights or duties, which, in legal contemplation, can be impaired.

Such we believe to be the true meaning of this clause of the constitution ; and such, we think, is the interpretation which has been given to it, in the cases where it has been under the consideration of courts of justice. *Fletcher* v. *Peck,* 6 *Cranch,* 87. *New-Jersey* v. *Wilson,* 7 *Cranch,* 164. *Terrett* & al. v. *Taylor,* 9 *Cranch,* 43. *Sturges* v. *Crowninshield,* 4 *Wheat.* 122. *Dartmouth College* v. *Woodward,* 4 *Wheat.* 518. *Green* v. *Biddle,* 8 *Wheat.* 1. *Atwater* v. *Woodbridge,* 6 *Conn. Rep.* 223. *Osborne* v. *Humphrey,* 7 *Conn. Rep.* 336. *The Derby Turnpike Co.* v. *Parks,* 10 *Conn. Rep.* 522. *Landon* v. *Litchfield,* 11 *Conn. Rep.* 251. *The People* v. *Platt,* 17 *Johns. Rep.* 195.

These principles are now to be applied to the case before us.

The first section of the act of 1816, authorizes the then agent of the state, or such as might thereafter be appointed, to settle and obtain the balance due the state from the *United States,* for advancements made by the state, for general defence, during the late war, and to receive the same in cash, stock of the *United States,* or other public securities.

The second section declares, that such " balance, when received, shall be, and the same is hereby appropriated for the support of religion and literature in the state," in the manner prescribed in the act.

The third section appropriates one third of what shall be received, for the use and benefit of the *Congregational* denomination of *Christians ;* and authorizes the treasurer of the state to receive and transfer the same to the congregational societies.

The fourth section appropriates one seventh of what shall be received, for the use and benefit of the *Episcopal* denomination of *Christians;* and authorizes the trustees for receiving donations for the support of a bishop, to receive and hold the same for the benefit of said fund.

*Hartford,*
June, 1839.
——————
Trustees of the
Bishop's Fund
*v.*
Rider.

The fifth section appropriates one eighth of what shall be received, for the use and benefit of the *Baptist* denomination of *Christians;* and constitutes certain persons trustees, and makes them a body politic and corporate, and authorizes them to receive and apply the same for the use and benefit of the *Baptist* societies.

The sixth section makes a similar appropriation and provision for the benefit of the *Methodist* denomination of *Christians,* as to one twelfth part of such balance.

The seventh section appropriates one seventh part of the balance, to the use and benefit of *Yale-College.*

The eighth section enacts, "that the unappropriated balance, when received, shall be and remain in the treasury of the state."

It is quite obvious, that this statute is not a contract *in form,* even if it be such in substance : and we are satisfied, that the act itself confers no right on the donors named in it, which a subsequent legislature cannot modify or controul.

The appropriation, when made, was not of moneys then in the treasury, or under the controul of the state    The account for disbursement was unliquidated.    It was to be adjusted and settled ; and whether any balance would be found due to the state, necessarily depended upon that adjustment.    The settlement was to be made, on the part of the state, by its own agents.    The corporations who might have an interest in the balance, by virtue of the act, were not authorized to interfere in the adjustment.    They would not have been recognized, by the accounting officers of the general government, as possessing any power to act in the matter ; nor would the state have been bound, by any act of theirs relating to it.    The whole subject of closing the account was under the controul of the state, who might appoint such agents as they pleased, and give such directions as to the time, manner and terms of settlement, as to them should seem proper.    The balance, when ascertained, was to be received, by the agents of the state, who alone had the power to receive it.    And it is not an unreasonable construction of the act, to declare, that the balance, when re-

*Hartford,*
June, 1839.

Trustees of the
Bishop's Fund
*v.*
Rider.

ceived by the agents, was to be paid into the treasury of the state. This is, necessarily, implied, as to that part of it appropriated to the *Congregational* societies ; for the treasurer is expressly authorized to receive and transfer it to them.   It would be difficult to find a reason to support a construction of the statute, which would make it the duty of the agents to pay a portion of the balance into the treasury, and the remainder, to the corporations for whose benefit it was appropriated.   The last section of the act contains a strong implication that the treasurer was to receive the whole amount which might be paid by the *United States.*   It directs, that " the unappropriated balance shall be and remain in the treasury ;" not that this unappropriated balance shall be *deposited* in the treasury, but that it shall *remain* there.   That which is to remain, is the residue of a larger sum previously deposited.   It is that which is *left* in the treasury, after the treasurer has made the payments directed by the act.   Such has been the practical construction of the act.   The record shows, that the whole was paid, by the agents, to the treasurer ; and that in the years 1817 and 1818, while the law of 1816 was in force, the plaintiffs received from him, the proportion of the sums to which they were entitled.

It is not material, however, to determine, whether the agents of the state could lawfully pay any part of the sums received by them, to any other person than the treasurer ; for it must be admitted, that they acted in behalf and by authority of the state, in the settlement of the account, and in receiving the balance due.   The act of 1816 is, therefore, substantially a legislative declaration, that a part of the balance, which should thereafter be received by the state, on an adjustment to be made under its authority, and by its agents, of an unliquidated account against the *United States,* the state would pay, in certain specified proportions, to the corporations named in the act, accompanied with a direction to its treasurer or agents, who might receive or hold it, to make payment accordingly. The most liberal construction of the act, can make its provisions equivalent only to a promise to pay to those corporations, in certain proportions, a part of a debt supposed to be due to the state, after the same should have been adjusted, and the amount been received by its agents.   It is apparent, therefore, that to carry into effect the views of the legislature, some further act was

to be done, by the state or its officers, to perfect and complete the object contemplated by the law of 1816. That law did not itself constitute a grant, or contract executed. Much remained to be done to consummate it. The account was to be settled, the balance ascertained and received, and a part, when received, was to be paid over to the several corporations specified. And all this was to be done by the state. The operation of the act was to be future. Every thing essential was to be done after the law was enacted, and to be done by the state ; and unless done, the law would be ineffectual. It bears no resemblance to a grant of money accompanied with delivery, or a grant of real estate, or of a franchise, which is made to take effect, by force of the grant itself. These would be contracts executed; and such rights as they conferred, could not be annulled at the pleasure of the grantor. But it is analogous to a promise to pay, or make a grant, which remains unexecuted until the money is paid, or the grant perfected.

If, then, the act of 1816 is to be viewed as essentially a contract on the part of the state, we think it is obviously a contract wholly executory, to be performed *in futuro*, requiring many acts to be done by the state, to complete it, and to accomplish the object contemplated by it. If the test established, by repeated adjudications, to distinguish between contracts executory and executed, be applied to this law, it will readily be perceived to fall within the former class. " An executory contract is one in which a party binds himself to do, or not to do, a particular thing. A contract executed is one in which the contract is performed, and differs in nothing from a grant."

If the act of 1816, be considered as an executory contract, and we think, for the reasons which have been suggested, it cannot be extended beyond this, the remaining inquiry is, whether it be such an executory contract as cannot be rescinded, by the legislature,—creating obligations which cannot be impaired by the state ? If the views which have been expressed as to the meaning of the constitution, be correct, an answer to this inquiry may easily be given. If the constitution has adopted the distinction between contracts executory and executed ; if it applies the same rules to them, when made by states as when made by individuals ; and if it does not mean to give any efficacy to nude pacts, nor create any new obligations, but only to preserve all the obligatory force of contracts,

*Hartford,*
June, 1839.
————
Trustees of the
Bishop's Fund
*v.*
Rider.

*Hartford,*
June, 1839.

Trustees of the
Bishop's Fund
*v.*
Rider.

which they have by the general principles of law, it follows as a necessary inference, that the executory contract we are now examining, like all other executory contracts, must be supported by a sufficient consideration ; else it confers no rights, and creates no corresponding obligations, which, in legal contemplation, can be impaired.   If the act of 1816 be merely a promise, that when a debt supposed to be due to the state, shall have been collected, by its agents, and paid over to the state, the state will deliver to the plaintiffs, as a gratuity, a portion of the amount received, and there is no consideration, actual or presumed, at any time subsisting, to sustain this promise, it cannot be denied, that it is a *nudum pactum.*   The authority to collect, and the promise to deliver, may be retracted, without contravening any legal obligation ; and a law which revokes the authority, or annuls the promise, is not a law impairing the obligation of a contract.   We are of opinion, that the act does not itself import to have been made upon any sufficient legal consideration.   None appears on its face ; nor does the record show that any consideration was proved to have existed at any time, nor any facts from which it can be presumed.   The act purports to be a mere gift or gratuity.   The state neither received any thing, nor the promise of any thing, to be given or done *in futuro,* when the law was enacted, nor at any subsequent period.   Nor does it appear, that the plaintiffs have sustained any loss or damage, which would not have accrued, had the act not been passed.   They have not foreborne or suspended any right or remedy at law or equity ; nor assumed any obligations ; nor incurred any expense ; nor suffered any loss or inconvenience, at the instance of the state, who made the promise, or in consequence of that promise.   They have paid nothing ; have done nothing ; have promised nothing ; have foreborne nothing.   They have only received, in former years, the proportion of the moneys to which they were entitled under the then existing laws ; and this is all which we know evincive even of their acceptance of the gratuity.   Had it been proved, that on the faith of the act, they had incurred obligations, which, without it, would not have been assumed, it would have presented a case materially variant from the one before us, and regarding which, it is both unnecessary and improper for us to express an opinion.

It is said, however, that a sufficient consideration to sustain

the contract implied in the act, is to be presumed from the *Hartford, June, 1839.* form of the contract, it being a legislative act of as high and solemn a nature as a contract under seal ; indeed, that it is much more so, being a record of the highest class, and unimpeachable. And it is insisted, that a law appropriating money implies a consideration, because it is matter of record of equal solemnity with a sealed instrument, and therefore, like the latter, imports a consideration, which, as between the parties, cannot be denied.    We think that no such analogy between records and deeds, as has been suggested, exists.    The doctrine of estoppel, which follows from the execution of specialties, has never, we believe, been applied to the entries which are made of legislative proceedings, or the formal record of them in books provided for that purpose.    It has never been supposed, that the law which authorizes millers to take increased toll, or that which grants licenses to lawyers, physicians and tavern-keepers, or that which bestows pensions, imports a consideration, because it is recorded.    And yet, all these laws are records of the highest class, and unimpeachable.

It has also been contended, that a sufficient consideration to support the contract, arises from the object to which the moneys were to be applied, when they should have been received by the plaintiffs.    The great interests of literature and religion were to be promoted by them.    In these objects the state have a deep interest ; and therefore, it is said, promises to make appropriations to secure and extend them, are founded on an adequate consideration.    If this position be tenable, it may be applied, with the same propriety, to a promise by an individual, as to one by the state, when it is made to promote the same object.    It certainly, however, cannot be seriously claimed, that a promise by an individual to pay money to a religious or charitable institution, imports a consideration, merely because it is to be applied, when paid, to the purposes for which the institution was formed.    *Limerick Academy* v. *Davis,* 11 *Mass. Rep.* 113.    Nor would a provision to pay money to relieve the necessities of the poor, or provide for the sick, import a consideration solely on account of the nature of the object to be attained by the performance of the promise.    We have not been referred to any precedent, nor have we found one, which would justify us in holding, that a consideration is to be inferred merely from the object to be effected by the contracting parties.

*Hartford,*
June, 1839.
Trustees of the
Bishop's Fund
*v.*
Rider.

These remarks are applicable to another claim of the plaintiffs, that the promise may be supported, having for its consideration the obligation of the donees to apply the sums, when received by them, to the purposes for which they were appropriated. An implied engagement to accept a gift, is clearly not a sufficient consideration to sustain a promise to make it. If it were, it would support every parol gift without delivery. Nor does the additional engagement, implied by law, to appropriate the gift according to the directions of the donor, create any adequate consideration. In neither case, is the mere engagement productive of any benefit to one party, or the occasion of loss to the other ; nor does it raise any obligation on the part of either, which can be enforced in law or equity. The implied promise to apply the fund in the manner directed by the donor, before the gift is made, is equally without consideration and legal efficacy as the promise to make the gift. Both are inchoate, imperfect, creating neither rights nor duties until the gift is perfected, either by delivery, or what is equivalent to it ; and then, and not before, the contract becomes executed by one party, and cannot be annulled at his pleasure, and obligatory on the other, as to all the conditions upon which he receives it.

In *October*, 1793, an act was passed, entitled " An Act for the establishing of a fund for the support of the gospel ministry and schools of education," declaring " that the moneys arising from the sale of the territory belonging to this state, lying *West* of the state of *Pennsylvania*, be, and the same is hereby established, a perpetual fund, the interest whereof is granted, and shall be appropriated, to the use and benefit of the several ecclesiastical societies, churches or congregations of all denominations in this state, to be by them applied to the support of their respective ministers or preachers of the gospel, and schools of education, under such rules and regulations as shall be adopted, by this or some future assembly." This act makes the fund perpetual, and appropriates the whole income of it to the objects specified, in language explicit and unequivocal. The power reserved to the legislature, is, to prescribe "rules and regulations" to govern the several societies, churches or congregations, in applying the income to the support of the ministry *and* schools. The appropriation is made for the benefit of *both ;* and the societies, churches or congregations, are constituted

the agents or trustees to make the distribution. The interest is " to be *by them*" applied. Was this act a grant, a contract executed; or an executory contract, made upon adequate consideration; either because it was a record; or was designed to promote literature or religion; or because the trustees would be compelled, upon the receipt of the moneys, to apply them to the purposes designated? If so, was it not a contract, whose obligations could not be impaired, by a subsequent law? And yet in *May*, 1795, a statute was enacted, expressly repealing the act of 1793, and appropriating the interest of the fund to the support of schools only, except in the cases and under the circumstances mentioned in the act, and containing other provisions essentially modifying and altering those in the act of 1793. In *May*, 1798, another law was passed, appropriating absolutely, the whole interest of the fund to the support of common schools. At a subsequent period, the management of the fund was entrusted to a commissioner appointed for that purpose; and in the constitution of this state, made in 1818, which contains a provision that "the validity of all contracts *of the state* shall continue as if no change had taken place," it is declared, that this fund shall remain a perpetual fund, the interest of which shall be inviolably appropriated to the support and encouragement of the public or common schools throughout the state, and that no law shall ever be made authorizing it to be diverted to any other use. Has it ever been supposed, that the act of 1793 conferred vested rights on the religious societies and churches, in this fund, and the management of it, which subsequent legislation could not vary or abrogate? Is the income of the school fund of this state *now* to be applied, in part, to the support of the ministry? And is the whole of it to be paid to the ecclesiastical societies, churches or congregations, to be distributed *by them*, among themselves and the several schools, as the legislature may prescribe? We should be somewhat surprised, if such a claim should be made by the religious societies. But has the claim of the plaintiffs, as presented by the record before us, any better foundation on which to rest, than that of these societies under the act of 1793? Is there any principle which would uphold the act of 1816, as a contract creating vested rights, which would not apply to that of 1793?

An allusion has been made to the supposed impolicy and

<em>Hartford,</em><br>June, 1839.<br>Trustees of the<br>Bishop's Fund<br><em>v.</em><br>Rider.

*Hartford,*
*June, 1839.*

Trustees of the
Bishop's Fund
*v.*
Rider.

injustice of the acts of 1833 and 1838. With these topics, this court has no concern. It is not our province to make law. Whether these statutes be wise or unwise, just or inequitable, are questions which we have neither the power nor the inclination to settle. The considerations connected with them should be addressed to that department of the government, which may, with propriety, be influenced by them.

In the case before us, we are satisfied, that the act of 1816, and the proceedings under it, so far as they appear from this record, vested no such right in the plaintiffs, to the sums of money which they now demand, as render the acts of 1833, and the act of 1838, invalid, as impairing the obligation of a contract. It was within the constitutional power of the legislature to pass those acts ; and when they became laws, it was the duty of the defendant to obey them. He has done so ; and consequently, the superior court correctly decided, that the return made by him to the alternative *mandamus*, was sufficient ; and that upon the facts stated in the action, and found by the court, the plaintiffs were not entitled to a peremptory *mandamus ;* and that their application be dismissed. The judgment of the superior court, is, therefore, affirmed.

In this opinion the other Judges concurred.

Judgment affirmed.