## NOVEMBER TERM, 1869.

HARRIS and others, appellants, and VANDERVEER'S EXECUTOR, respondent.

1. An appeal will lie by force of the act of 1869, from a decree of the Prerogative Court in a matter of probate to the Court of Errors and Appeals.

2. Such act is not unconstitutional.

3. The peculiar quality of a constitutional court is, that it cannot, in its fundamental constitution, be altered by the legislature, nor in any other manner than in the mode prescribed in the Constitution; but an enlargement of jurisdiction is not such an alteration.

4. The phrase " as heretofore," in Article VI, section 1, of the Constitution, if descriptive of the jurisdiction of this court, has no important significance, as the jurisdictions of all the constitutional courts, by necessary intendment, are established as they existed antecedently to the date of the Constitution.

5. The Prerogative Court is not, by its nature, a court of the last resort, and there is nothing in the present Constitution making it such.

The cases of *Hillyer* v. *Schenck*, 2 *McCarter* 501, and *Anthony* v. *Anthony*, 1 *Halst. Ch.* 627, commented on.

This was a motion to dismiss the appeal, on the ground that an appeal did not lie from a decree of the Prerogative

Court, and that the act of the legislature granting an appeal from that court was unconstitutional. The act in question will be found in the laws of 1869, page 84.

*Mr. Williamson,* in support of the motion.

*Mr. Vroom, Mr. Wurts, Mr. Bradley, Mr. Shipman,* and *Mr. C. Parker,* contra.

THE CHIEF JUSTICE.

By an act of the legislature of this state, approved the 17th of February, 1869, it is provided that "all persons aggrieved by any order or decree of the Prerogative Court, may appeal from the same" to this court, "in the same manner in all respects as now provided by law for appeals from the Court of Chancery." The present case is now before us by virtue of this provision, and a motion is made to dismiss this appeal on the ground that the statute above recited is in conflict with the Constitution of this state. The important question thus presented has been argued by distinguished counsel on both sides with pre-eminent zeal, learning, and ability, and this court has given it that full consideration which is due to every case involving the construction of that fundamental law which regulates and controls, in all its departments, the government of the state.

There are two primary principles which are always to be borne in mind in the discussion of every question touching the limitations of the authority of the legislature of the state. The first of these is, that the legislative body is supreme, in every respect, except in the enumerated instances of constitutional restraints; and next, that such restraints cannot be imposed but by plain language, or by implication necessarily springing from the co-ordination of the several parts of the established system of government. It is evident, therefore, that the present motion cannot prevail, unless it can be made plain to the mind of the court that some provision of the Constitution exists which prevents the assumption by the

legislature of the authority to pass the act in question. In the opinion of the legislative and executive branches of the government, this power exists. That opinion. is entitled to the utmost respect, and it can, with propriety, be superseded only when this court is convinced beyond a doubt, that it is founded in error or misconception.

The proposition to be considered then, is, not whether doubts exist as to the power of the legislature to enact the law in question, but whether it is positively certain that such power has been taken from them. I will examine the question in this light.

Section 1 of Article VI of the Constitution, is in the words following : " The judicial power shall be vested in a Court of Errors and Appeals in the last resort in all causes, as heretofore; a court for the trial of Impeachments; a Court of Chancery ; a Prerogative Court; a Supreme Court ; Circuit Courts ; and such inferior courts as now exist, and as may be hereafter ordained and established by law ; which inferior courts the legislature may alter or abolish, as the public good shall require."

And by the last clause of section 1 of Article X, it is further ordained that " the several courts of law and equity, except as herein otherwise provided, shall continue with the like powers and jurisdiction as if this Constitution had not been adopted."

These are the general provisions providing depositaries for the judicial power.

In an examination of these sections the first thing which attracts attention is this : that the instrument itself establishes certain courts. It does not leave that all important work to other hands. An omission in this respect in the Constitution would have left the judicial system without any fixity whatever. In such a state of things, the powers, jurisdictions, and even the very existence of the several courts would have been placed under the control of the legislature. They could have been altered or abolished by that body at will. But the convention had no such pur-

pose as this, and they, therefore, enumerated the superior tribunals in which was principally to reside the judicial power of the government. By that enumeration, those tribunals became constitutional courts, that is, courts that could not be altered or abolished, except by an alteration of the instrument creating them. The peculiar quality of a constitutional court, or of any other constitutional establishment, is this, that it is not susceptible of change in its fundamental principles, except in some prescribed mode. Thus, for example, the nature of this court, or the nature of the Supreme Court, cannot be altered in any way but one, that is, by a modification of the Constitution itself. It is presumed that no professional gentleman would, for an instant, contend that the legislature could deprive the decrees and judgments of this court of their quality of being conclusive, or could take from the Supreme Court any of those prerogative writs by which inferior jurisdictions are superintended and regulated. The power to do this would involve the power to modify in essential particulars the constitution of these courts; a power not to be distinguished from an authority to supersede or abolish. It is entirely clear then that the legislature has not the competency to impair the essential nature or jurisdiction of any of the constitutional courts. To this extent, it seems to me, the subject is too plain for discussion.

And it is at this point that the controversy in this case supervenes; for it is insisted that the act of the legislature giving an appeal in this case has a two-fold operation, inconsistent with the Constitution; first, in extending the powers of this court; and second, in curtailing the power of the Prerogative Court.

First, then, in regard to its effects upon this court.

It is admitted, and is indisputable, that from the surrender of the proprietary government to Queen Anne, in 1702, to the present time, neither this court nor its provincial prototype, has ever claimed any supervision over the decrees of the Prerogative Court. The legislature has now

Harris *v.* Vanderveer's Executor.

extended the jurisdiction of this court to that extent, and the question is, whether there is anything in the Constitution plainly prohibitory of such an act.

Now it is obvious to remark, that in such a jurisdiction there is nothing inconsistent with the nature of this court. It is constituted expressly "a Court of Errors and Appeals in the last resort in *all. causes,*" and it is therefore undeniable that the placing a new class of cases within its control is in complete harmony with its structure. It seemed to be conceded indeed, upon the argument, that the jurisdiction now claimed was not incongruous with the general character of this court, and consequently reliance was mainly placed by the counsel of the respondent on certain terms made use of in the Constitution itself. The words thus alluded to occur in the phrase before quoted, *viz.* "The judicial power shall be vested in a Court of Errors and Appeals in the last resort in all causes *as heretofore;*" the insistment being, that the expression "as heretofore," refers to the antecedent word "causes," and is thereby restrictive of the jurisdiction of the court. But in my opinion this construction is clearly inadmissible. I will state a few objections to this view, which to my mind are conclusive against it.

Thus, it involves a jurisdiction absolutely stationary and immovable in every court of the state. This results from the fact that it is impossible to increase the jurisdiction of any of the subordinate courts without, to the same extent, increasing the jurisdiction of the court of the last resort. Thus, if a new class of cases is brought by the action of the legislature, within the grasp of the Supreme Court or of the Court of Chancery, that same class of cases, *ipso facto,* is put under the supervision of this court. It is not to be presumed that any one will contend that new classes of causes cannot, with legislative assent, be taken under the cognizance of the subordinate courts just referred to. I have said that the essential qualities of all the constitutional courts are indestructible and unalterable by the legislature.

But an extension of the jurisdiction of a court, such extension being in harmony with its character, and not being a usurpation on the inherent powers of any other court, is not within the constitutional prevention. Perhaps there is no constitutional court in this country, the sphere of whose operation is entirely beyond legislative extension. The nearest approach to this condition may, it is probable, be found exemplified in the several courts of the United States; but this absence of jurisdictional extensibility, so to speak, results, not so much from limitations prescribed to the courts, nor from the character of the tribunals themselves, as from the restricted nature of the scope of federal legislation. In the judicial system of a state, few things can be imagined more obstructive of the progress of society than courts with jurisdictions absolutely fixed. I have said such a contrivance is an anomaly no where to be found; it is certain it cannot be pretended to have ever existed in this state. From the earliest times, every session of the legislature has added to the subjects of judicature, and the jurisdiction of our courts has been adjusted to this ever varying condition of things. I will instance one case out of a multitude. In the year 1848, the legislature gave a remedy by action in cases of death resulting from a wrongful act or neglect. This was the creation of new causes of action. The Supreme and Circuit Courts have taken cognizance of this class of cases. Can any one pretend that this court must not finally adjudge the law of such cases? And yet it is certain that this court is barred of such jurisdiction, if the words " as heretofore " have the significance with which they are clothed by the counsel of the respondents.

But again, to look at the contention in its opposite aspect. Suppose we assume that the words " as heretofore " confine the jurisdiction of this court to the precise limits it possessed at the time of the adoption of the Constitution. Is the argument in favor of a dismissal of this appeal thereby strengthened? I am not able to perceive that such is the case. I hold it is entirely clear that the jurisdiction of this

court was, before the constitutional epoch, susceptible of in-crease by the power of legislation. One or two historical incidents will show conspicuously the truth of this conclu-sion. By the 9th section of the Constitution of 1776, it is provided "that the governor and council (seven whereof shall be a quorum), be the Court of Appeals in the last resort in all causes of law, *as heretofore*." At this date, and all through the times of the provincial government, the Court of Chancery had existed as an independent tribunal. Origi-nally the power of this important court was lodged in Lord Cornbury and his council; and subsequently by his ordi-nance to that effect, Governor Franklin took the office into his own hands exclusively. It was not until the 13th of June, 1799, that the act was passed giving an appeal from the Court of Chancery to the old Court of Errors and Ap-peals. When the Constitution, therefore, of 1844 was estab-lished, the jurisdiction of this court, so far from its being what it is now claimed to be, a jurisdiction utterly un-changeable, had been, and then was susceptible of enlarge-ment by the legislature of the state. Accepting, then, the words "as heretofore" in the Constitution of 1844, as terms descriptive of the powers of this court, it seems inevitably to result that a capacity to expand now exists in this court, as it certainly theretofore had existed. Nor do I find any force in the argument that the extension of appellate juris-diction over the Court of Chancery by the act just referred to was a usurpation on the part of the legislature, and in vio-lation of the old Constitution. I am aware that Mr. Griffith, in his Law Register, has expressed that opinion; but this opinion is certainly entitled to no weight whatever when opposed to the settled practice of the courts, and to the ac-quiescence of the bench and bar of the state for a long series of years. Besides, as it strikes my mind, nothing can be more inadmissible than the notion that these words, "as heretofore," in our present Constitution, can be supposed to refer to a merely imaginary jurisdiction which had never, in point of fact, existed. It seems to me self-evident that if we

are to consider this expression as descriptive of the ancient Constitution of this court, and are to resort to it as a model to which it is to conform in the future, we must look for such model among the realities of history, and not grope for it amidst the speculations of the closet, for it is evident that the entire subject would be open to the wildest conjecture if we assume that the phrase in question indicates a jurisdiction which had never been reduced to practice, but had existed solely in the minds of theorists. I conclude then most confidently, that the judicial history of the state shows conclusively, that prior to the date of our present Constitution the jurisdiction of this court was capable of enlargement by legislative assistance. The consequence is, that if the phrase just quoted is to be taken as one of jurisdictional description, it does not indicate a court with fixed boundaries, but, on the contrary, one with an enlarging jurisdiction. This phrase, therefore, construed even in this sense, does not militate against the validity of the act now under discussion.

And it will also be observed this same fact disposes of the notion broached on the argument, and which I think is entirely without foundation, that the old Constitution of this state was not possessed of the usual sanctions of such an instrument, and that it was consequently regarded as alterable by the legislature at their pleasure, and that it was on this ground that they arrogated the power to extend the control of this court over the Court of Chancery. Admitting this assumption, it cannot affect our conclusions. In fact, it is a circumstance which can be made of importance in this argument, only, as it seems to me, by a confusion of ideas on the subject. For if, as I have just remarked, the words "as heretofore," investing them with all the force which is claimed for them, must, by logical necessity, be applicable to a practical and not to a visionary jurisdiction antecedently existing, it seems evident that it is a matter of entire indifference, so far as this discussion is concerned, whether such jurisdiction had been the product of legisla-

tive usurpation, or of rightful power.  For all the purposes
of construction, the only possible inquiry can be, what the
former jurisdiction of·this court was in point of fact, not
what it ought to have been, nor whence it arose.  As an his-
torical fact, it cannot be denied that it had been a jurisdic-
tion extended by legislation; all that the·advocates of the
legality of the present statute claim is, a jurisdiction pos-
sessed of a similar capability of extension.

It is proper here, also, to observe that in my apprehen-
sion the constitutional phrase "all causes as heretofore,"
cannot, by any just mode of exposition, be interpreted to
mean any particular divisions or classes of causes.  It is
not practicable, in my judgment, so to restrict their signifi-
cation.  If they do not embrace what they clearly sig-
nify, "all causes," to what trains of cases are they to be
confined?  Certainly, it cannot be contended that the phrase
relates to causes in law and equity alone, and omits all
·ecclesiastical cases.  This obviously cannot be their mean-
ing, because it would not embrace all the cases admittedly
within the province of this court.  By the act of the 2d of
December, 1794, the Court of Chancery was vested with
cognizance over cases of divorce and alimony.  They are
manifestly branches of ecclesiastical jurisdiction, and conse-
quently at the date of the present Constitution, the power to
supervise in those matters existed in this tribunal.  Being
in the full possession then of jurisdiction in causes, some of
which were legal, others equitable, and others again eccle-
siastical, how can the constitutional expression, "all causes,"
be held to point to any particular subdivision of causes?
There is no part of the context by which the meaning of
these words can be so controlled.  I can see nothing in the
instrument itself which will authorize the court to constrain
into narrower limits·the generality of the expression.

Nor should it be overlooked, that by holding this phrase,
"all causes as heretofore," to be descriptive of jurisdiction,
they are imperfect even for that purpose; they will not
properly describe that jurisdiction which the counsel of the

respondents apportion to this court. I shall hereafter show that cognizance of causes with respect to the accounts of executors and administrators, was vested, at the date of our present Constitution, in the Supreme Court, and consequently, was supervised by this court. This branch of the jurisdiction of this court has been cut off by the Constitution itself, and is now in the hands of the Prerogative Court. How, then, unless an appeal is given from the Prerogative Court to this court, can it be maintained that the jurisdiction of this court is now as it was "heretofore," *i. e.*, as it was at the date of the present constitution?

In fine, upon this topic, I remark, that in my opinion this expression "as heretofore," is almost valueless as a phrase of jurisdictional description. In my apprehension nothing can be more evident, than that all the courts designated in the Constitution must of necessity be possessed of their certain jurisdictions. What is the jurisdiction of the Supreme Court, if it is not that power with which it was endowed at the time the Constitution was established? As the province of that court is not defined in the Constitution, by inevitable intendment its primitive constitution remains. Its jurisdiction, then, speaking as of the date of the Constitution, is "as heretofore;" and so is the jurisdiction of every other constitutional tribunal; and it is this jurisdiction which has been placed beyond the reach of the legislative power. But as I have already remarked, an aptitude for enlargement, from the inherent nature of judicial institutions, appertains to every constitutional court. And the consequence is, that when the Constitution vests power in a court "as heretofore," and declares that the several courts shall continue with like powers and jurisdiction as though the Constitution had not been adopted, the effect is, that the primitive powers of such tribunals remain inalienably established, while at the same time there is implanted in them that principle of development by which their cognizance may be extended over new cases as they arise, and which principle is a part of their very nature and constit

tion.  Looking at the subject, therefore, in either point of view, I have no doubt that the jurisdiction of this court is extensible at the will of the legislature, provided, by such extension, the province of no other court or department of government is intrenched upon or invaded.

This result introduces the next branch of the inquiry.

Second.  Does the act in question, in a constitutional point of view, alter or impair the constitution or jurisdiction of the Prerogative Court?

This point was not much insisted on, and I shall dispose of it very briefly.

The Prerogative Court has constitutional sanction, and according to the principles already propounded, cannot be shorn of any of its inherent functions or substantial jurisdiction.  Consequently, we must look at its constitution to ascertain if the law under review has such effect.

This court has always been possessed of certain branches of jurisdiction which reside in the ecclesiastical tribunals in England.  Hence, it has ever been regarded as an ecclesiastical court, and therefore does not properly come under the denomination of a court of law or equity.  And it is certainly somewhat remarkable, that in section 1 of Article X of the Constitution, which in express terms, clothes the courts with their ancient powers, this court is not included.  The language is, "the several courts of *law and equity,* except as herein otherwise provided, shall continue with the like powers and jurisdiction as if this Constitution had not been adopted."  This language will not, in strictness, comprehend the Prerogative Court, and from this omission an argument might be drawn that its powers and jurisdictions are not so fully guarded by the Constitution, as are those of the courts which are embraced within the description of the clause.  But on this circumstance I shall at present place no stress, but shall consider this tribunal as established, perpetuated, and protected, to the full extent by the Constitution.  The question then arises, is there anything in the

history or nature of this court which will prevent its decisions from being made appealable?

At the time of the surrender of the proprietary government to Queen Anne, the whole of the ecclesiastical jurisdiction over New Jersey was reserved to the Bishop of London, excepting only the collating to benefices, granting licenses to marry, and the probate of wills, which were granted to the governor.

By the Constitution of 1776, the only ecclesiastical court that was preserved in our system was that of the Ordinary. That office being placed, as it had formerly been, in the governor of the state. In the act of the 16th of December, 1784, (*Pat. Laws* 59), it is declared " that from and after the passing of this act, the authority of the Ordinary shall extend only to the granting of probates of wills, letters of administration, letters of guardianship, and marriage licenses, and to hearing and finally determining all disputes that may arise thereon." By the same act, original jurisdiction in matters of probate and of administration, with an appeal to the Prerogative Court, was conferred on the Orphans' Court, a tribunal created for that purpose. By this and subsequent statutes, various powers of a most important character were vested in this subordinate court, such as the final settlement of the accounts of executors, administrators, and guardians, the partition of the lands of minors, and the sale of the lands of deceased insolvents. The superintendence of the exercise of these superadded functions was given to the Supreme Court by certiorari. Nor did the legislature hesitate to transfer to the Orphans' Court powers which the Prerogative Court had before exercised. An instance of this will be found in section 27th, in the act of the 13th of June, 1820, (*R. L.* 784), which provides that the powers and duties formerly exercised and performed by the Ordinary, relative to the admission of guardians for persons under the age of twenty-one years, should thereafter be performed by the Orphans' Court, subject to an appeal to the Prerogative Court. And in this same statute

we find that the power to grant licenses of marriage is taken from this same officer. From these facts and others which it would be tedious to adduce, it is clear that a control was exercised by the legislature over this court, greater than any ever attempted to be exerted with respect to any of our other judicial tribunals.

The Constitution of 1844 then came into existence, establishing the Prerogative Court and giving it an appeal over every decree of the Orphans' Court. That large body of decrees of the Orphans' Court, in matters of accounts, &c., which formerly by certiorari had been removable into the Supreme Court, and thence into this court, were thus diverted into the Prerogative Court.

From this statement it will be observed that the legislature of this state have from time to time, in many important particulars, altered and regulated the jurisdiction of the Prerogative Court, and that the powers which that court now possesses is not altogether of an ecclesiastical character, but is largely made up of purely civil business, conferred upon it by legislative and constitutional grant.

Is there any thing, then, in the nature or history of such a tribunal as this, which should make its decrees final? I do not mean whether it is proper or politic that they should be so; but is such an incident necessarily inherent in the constitution of the court itself? If we regard it as of ecclesiastical origin, its decisions have no claim to conclusiveness. In the English system the decrees of the Prerogative Court are subject to review in the Court of Delegates. This has been the case since the time of Henry VIII. A Prerogative Court, then, is not and never has been, from its constitution, a court of the last resort. What, then, has so modified its nature as to bestow upon it such a character in this state? If I could perceive that from its organization, or the character of its jurisdiction, the decrees of this court must be unappealable, I should feel constrained to say that the legislature could not alter their nature and make them appealable. Under such circumstances, a modication of the efficaciousness of the decrees of such a court would to be

alter, in an essential manner, the court itself. It would amount to an organic change in a constitutional tribunal. But I do not find any thing which leads me to conclude that the decrees of this court are or ever have been final in their nature, and consequently there is nothing in the statute now in question, which is calculated to detract from the Prerogative Court any of the powers which have been placed in it by the Constitution. The scope of its jurisdiction is not in any degree curtailed; all that is done is to deny to its decisions a quality which has never been claimed to appertain to such a tribunal. When we wish to ascertain the inherent powers of any of our superior courts, we look, of necessity, to their English models. How otherwise can it be ascertained what is the character and effect of a judgment of the Supreme Court of this state? By what other standard is the Court of Chancery to be measured? Is there any other test, then, to be applied to the decrees of the Prerogative Court? I know of none; and if we resort to this test, such decrees are plainly of an appealable character.

Nor does the consideration, that an appeal from this court has never heretofore been taken, weigh much with me against this view. In the absence of a statute authorizing such an appeal, the superintending power of this court would lie in abeyance. There is a precedent for such a course. Until the legislature intervened, as has already appeared, this court did not assume jurisdiction over decrees in the Court of Chancery. I do not incline to the view, that an appeal from the Prerogative Court to this court would have lain without the help of legislation. This court in many respects, both in matters of jurisdiction and practice, takes as its pattern the English House of Lords, a tribunal which does not entertain appeals in ecclesiastical affairs. To take such cognizance, is undoubtedly an amplification of the practice of this court, and such amplification could, properly, be effected only by the co-operation of the legislature. Under these circumstances a course of practice in this court, no matter how long continued, exhibitive of the absence of

all exercise of appellate powers, is not to be wondered at, nor does it press much against the act under consideration.

Nor can I regard this question as *res adjudicata.* The case of *Hillyer* v. *Schenck,* 2 *McCarter* 501, has no application, as the appeal in that case did not rest in legislative authority. As to the remaining case of *Anthony* v. *Anthony,* 1 *Halst. Ch.* 627, the grounds of judgment are left to conjecture, as they are not shown in the report, and it is quite impossible to say on what precise reason the court acted. The argument was *ex parte,* and appears to have consisted in a bare suggestion of the grounds relied on. There was a circumstance in the case, foreign to the present issue, upon which the court may have relied. Nor do I see how it can be maintained that this decision involved the construction of the present Constitution. It is true, that it was made after the present Constitution went into effect, but the appeal was taken before that event. The present Constitution preserves all actions antecedently pending, but as it could not validate one which had been erroneously commenced, the only question which could have been disposed of in the case referred to, must have been relative to the effect of the old Constitution of 1776. The appeal had been taken in 1843, and the question was, whether a right of appeal at *that time* existed. Whether it existed by force of the Constitution of 1844, had nothing to do with the inquiry. A precedent so obscure and uncertain, ought not to preclude this court in the exercise of a free judgment in so important a matter as that now under consideration.

My conclusions, then, are as follows :

First. That this court, like all other constitutional courts, has not an inflexible jurisdiction, but that such jurisdiction can be extended by legislative action.

Second. That the Prerogative Court is not, by its nature, a court of the last resort, nor has it been made such by the Constitution of this state, and that consequently its decrees may be subjected to the superintendency of this court.

The motion to dismiss this appeal should be denied.

VAN SYCKEL, J.

The question in this case is, whether it was within the power of the legislature to pass the act of February 17th, 1869, (*Laws of* 1869, *p.* 84,) giving an appeal from the decree of the Prerogative Court.

The legislative power must be conceded, unless some provision can be shown in the Constitution of this state, which expressly or by necessary implication operates as a restraint upon it. Such limitation is claimed to exist in Article VI, section 1, in these words: "The judicial power shall be vested in a Court of Errors and Appeals in the last resort in all causes, as heretofore."

At the time of the adoption of the first Constitution of this state, July 2d, 1776, no right of appeal to the court of last resort existed in equity cases. In that Constitution it was provided "that the governor and council (seven whereof shall be a quorum) shall be the Court of Appeals in the last resort in all causes of law, as heretofore."

In 1799, twenty-three years after the adoption of this Constitution, and while the force of the words "as heretofore," must have been well understood, the legislature passed an act giving an appeal from decrees in chancery, and in 1820 extended that right to cases not within the act of 1799. Under these acts the right of appeal from chancery was maintained, without being questioned in this court, from 1799 to the time of the adoption of the new Constitution in 1844. Whether the act of 1799 was in violation of the old Constitution, is not necessarily involved in the discussion of this case.

The virtue of these words, "as heretofore," to operate as a restraint on legislative action, had received, before 1844, an interpretation which had been acquiesced in for forty-five years. The legislature had claimed and exercised the right, notwithstanding these words, to extend the right of appeal to cases in which such right did not exist at the time the first Constitution was framed.

When the convention which framed the Constitution of

1844 incorporated in it the words "as heretofore," they must have done so in view of the construction which had been put upon those words, in view of the fact so well known to the learned lawyers who participated in the proceedings of that convention, that notwithstanding those words, the legislature had, under the old Constitution, extended the right of appeal. It is impossible to believe that words which had received such fixed interpretation would have been employed by the framers of our new Constitution, if it was their intention to exclude the legislative power. If they had deemed the act of 1799 unconstitutional, they would, instead of using the very terms that the legislature had held not to limit their power, have been most careful to guard against legislative usurpation by express and unmistakable words of prohibition. That they understood the necessity of employing such express language where the intention to exclude existed, is manifested by pl. 3, section 4, of Article VI, which provides that the decrees of the Orphans' Court shall not be removed into the Supreme Court or Circuit Court, in cases where the Orphans' Court has jurisdiction.

The motion to dismiss this appeal rests upon the unconstitutionality of legislative enactment. Its unconstitutionality must be clear and palpable.

Every intendment must be made in favor of legislative power. Learned judges have, with great unanimity, laid down a rigid rule on this subject. Chief Justice Marshall, in 6 *Cranch* 128, Chief Justice Parsons, in 5 *Mass.* 534, Chief Justice Tilghman, in 3 *S. & R.* 72, Chief Justice Shaw, in 13 *Pick.* 61, and Chief Justice Savage, in 1 *Cowen* 564, have, with one voice, declared that "it is not on slight implication and vague conjecture that the legislature is to be pronounced to have transcended its powers, and its acts to be considered void. The opposition between the Constitution and the law should be such that the judge feels a clear and strong conviction of their incompatibility with each other."

No express exclusion of the legislative power can be shown;

it is claimed to exist only under the words "as heretofore;" and if any reasonable construction can be put upon those words, which will avoid conflict between the legislative and judicial branches of the government, it is our duty to adopt it. It is not difficult to suggest such construction.

The act in question is a reasonable one; it enlarges the right of the citizen; it brings the practice in the Prerogative Court into harmony with that of every other court in the state, and removes what has always been regarded as an anomalous feature in our judicial system.

The words "as heretofore," are used either to express the location of power, or else are jurisdictional. In the former sense, they mean that as there had been a court of last resort theretofore, so the Court of Errors and Appeals should continue to be the court of last resort in all causes, and that the legislature should not establish any court of higher power. It is doubtful for which of the two purposes they were used, but the latter seems to be the more reasonable construction. Admitting that the true reading of the clause is, "in all causes with the same power as heretofore," what would be its effect upon the solution of this question?

Just here occurs the radical error in the argument against the validity of the act of 1869, resulting from a misconception of the rules of construction which must be applied to this case. The rule which governs in testing the constitutionality of acts of the national legislature cannot apply here. When we look to the constitutionality of an act of congress, it must be shown to be within the powers enumerated in the Federal Constitution; in other words, authority for it must be shown. But we have engrafted upon our state legislative system the doctrine of supremacy which belongs to the English Parliament, and when we ask the state legislature for their power to pass a given law, they reply, our power is supreme, except in so far as you can show a limitation of it in the Federal or State Constitution.

Applying this rule, the effect of the words, "with the same powers as heretofore," would be to establish a court of

last resort with powers which cannot be taken away. This expresses. very clearly that it was the intention of the framers of the Constitution to put it beyond legislation to diminish these powers. But where is the language which says that this court shall never have an enlargement of its jurisdiction ? It shall have the powers specified, and remain inviolate as to those, and in securing that end, these words, " as heretofore," have spent their force.

When the Constitution asserts that this court shall have the same jurisdiction as heretofore, we are led to inquire what power it had under the old Constitution. The history of legislation, in connection with the history of this court, shows that the legislature from time to time enlarged the powers of this court, but never in a single instance claimed to reduce it, and thus it indubitably appears, that under the old Constitution, this court had such jurisdiction as it had prior to 1776, and such power as legislation conferred upon it. It seems difficult to escape the conclusion that the words " as heretofore," in the new Constitution, were no more words of exclusion than they were under the old Constitution, and that they were intended to define, not absolutely to limit the powers of this court, and to secure them against diminution, leaving to the law maker the right to augment its jurisdiction as a Court of Appeals in the last resort. This view is supported by the last clause of pl. 1, Article X, of the Constitution of 1844, which provides that " the several courts of law and equity, except as herein otherwise provided, shall continue with the like powers and jurisdiction as if this Constitution had not been adopted," clearly indicating the right of this court to have its powers amplified to the same extent that it could have been done under the old Constitution.

If an attempt had been made to establish a court with inflexible jurisdiction, different language would have been used; so vital a matter would not have been left to doubtful and uncertain inference. No one can read the Constitution without being impressed with the fact, that its framers carefully avoided a strict definition of the powers of the courts; and if they had not done so, it would necessarily and inevi-

tably have led to much difficulty, and have left many cases which could not then have been foreseen, without adequate remedy. It certainly cannot be said that the words "as heretofore," clearly and beyond any reasonable doubt, were used to limit the jurisdiction of this court within a sphere beyond which it cannot be extended, and if no other argument could be addressed to us, than that it is a matter of doubt, that alone should be sufficient to prevent judicial interference with legislative action.

There are but two reported cases in this state which bear directly on the question under discussion. The first is *Anthony* v. *Anthony*, 1 *Halst. Ch.* 627; in which an appeal taken by virtue of the 7th section of the act concerning dower, passed February 24th, 1820, (*Elmer's Dig.* 145), from the final decree of the Ordinary, approving and confirming the report of commissioners assigning dower to Elizabeth Anthony, was dismissed. No opinion in this case is reported, nor is the ground upon which the dismissal rested, stated by the court. The history of the case shows that the appeal had been taken in 1843, and was dismissed in 1846. It was argued *ex parte*, and the court dismissed it for want of jurisdiction, without giving us the reasons which led to that result. A want of jurisdiction in that case might have rested upon a reason that would not apply here. A special power was given to the Ordinary in relation to dower; the same power might have been conferred upon a master in chancery, or a commissioner, and it is questionable whether the right to supervise persons exercising a special statutory authority, which, under our judicial system, inheres in the Supreme Court, could be taken away by legislative act. If it could in one case, it might in every case, and thus one of the very highest and most important functions of the court would be endangered, if not destroyed. But if this view was not taken in that case, it is highly improbable that the court after full argument would have admitted a want of jurisdiction, when for so many years their right to hear appeals from chancery rested on no better foundation. There

is, therefore, nothing in this case which should prevent the members of this court from yielding to their own judgment in so grave a question after deliberate argument and full consideration.

The other case referred to is *Hillyer* v. *Schenck,* 2 *Mc-Carter* 501; to which it is a sufficient answer to say, that at that time there had been no legislative action authorizing an appeal to be taken.

The legislature, under the old Constitution, in passing the acts of 1799 and 1820 respecting appeals from chancery, and the supplement of February 24th, 1820, to the act concerning dower, and under the new Constitution in passing the act of February 26th, 1858, giving a review by this court of proceedings in criminal cases by writ of error directed to the Oyer and Terminer, have construed the Constitution liberally, and have not treated the words " as heretofore," as words of strict limitation. A like liberality has been manifested by the Supreme Court, and the court of last resort, in 2 *Southard* 861, 2 *Green* 223, 7 *Halst.* 368, and other cases readily referred to, in reviewing cases which had never arisen prior to the formation of the first Constitution.

It was intimated that no argument can be drawn from legislation under the first Constitution, because then the legislature, like the English Parliament, was supreme, and had a right to pass the act of 1799, even against an express interdiction. This is an entire misapprehension of the character of the first Constitution, as must be apparent from our judicial history, showing that the constitutionality of legislative acts passed in review before the courts. In the very case cited of *Anthony* v. *Anthony,* the question of constitutionality was raised. Certainly Mr. Griffith would not, in his Law Register, have so earnestly insisted upon the unconstitutionality of the act of 1799, unless it was well understood in his day that the legislative will must act within certain prescribed limits.

There is another fact in the history of legislation on this

subject, which has a very important bearing on this case. By an act passed December 2d, 1794 (*Pat. Laws* 143), the Court of Chancery for the first time was invested with jurisdiction over alimony, marriage, and divorce, subjects until then within the jurisdiction of the ecclesiastical courts. The passing of these matters from the ecclesiastical courts to chancery, subjected them to review in the court of last resort, where, before that, they could not have gone. The power of the legislature to pass the act of 1794 has never been questioned, and it must be admitted that if a portion of the causes of ecclesiastical jurisdiction can be brought by the law making power within the reach of this court, the right of appeal can be extended to all cases.

It is also a noticeable fact that the new Constitution takes away from the Supreme Court the power to review by certiorari the proceedings of the Orphans' Court, in cases where the Orphans' Court has jurisdiction, and has enlarged the power of the Prerogative Court by giving to it that right of review. It should require clear language to lead to the conclusion that it was intended in these cases to prohibit the legislature from giving an appeal to the court of last resort, such right having existed under the old Constitution.

It is very difficult to conceive of any reason which could have influenced the framers of our Constitution to put it beyond the power of the law maker to give an appeal from the decree of the Prerogative Court. It was not, as will hereafter appear, because an appeal from the Prerogative Court to the judges of the common law courts was unknown to the judicial system from which our own was borrowed. It was not for the reason that the decrees of the Ordinary were invested with peculiar sanctity, for the Chancellor, from whom an appeal was given, was made Ordinary; and it could not have been from any want of confidence in the court of last resort, because matters of the highest concern in all the other courts were placed within their review.

There is, therefore, nothing in the language of the Constitution itself, or in the interpretation it has received, either

in the course of legislation or judicial consideration, which impels this court to arrest the operation of the act of 1869.

It may be urged that while the legislature has power to extend the jurisdiction of this court, it has no right to abridge the powers of the Prerogative Court, and that one of the essential powers of that court is the finality of its decrees. If, under the English system, finality had been a feature of the Prerogative Court, the argument would have great force; but in view of the fact that the Prerogative Court in England is subject to appellate jurisdiction, no possible difficulty can be suggested in the way of subjecting its decrees to appeal here, which would not have applied with equal force to decrees in chancery, for both courts were adopted in this state without the right of appeal.

It was warmly urged upon the argument that although there is an appeal in England from one ecclesiastical court to another, such a thing was never heard of as an appeal from an ecclesiastical court to common law judges, and that the framers of our Constitution could never have contemplated any such thing. This argument rests upon an erroneous statement.

By the statute of 24 *Henry VIII, ch.* 12, *sec.* 8, any cause commenced before the archbishop was to be definitely determined by him without any appeal, and by the 6th section of the same act, appeals to the archbishop were to be " definitely and finally ordered, decreed, and adjudged by him, according to justice, without any other appellation or provocation to any other person or persons, court or courts." But by a later statute, 25 *Henry VIII, ch.* 19, after prohibiting appeals to the Pope, it was enacted by section 4, that " for lack of justice at or in any of the courts of the archbishops of this realm, or in any of the king's dominions, it shall be lawful to the parties grieved to appeal to the king's majesty in the King's Court of Chancery; and that upon every such appeal a commission shall be directed under the great seal to such persons as shall be named by the King's Highness, his heirs or successors, like as in cases of appeal

from the Admiral's Court, to hear and definitely determine such appeals, and the causes concerning the same, &c." These commissioners were called delegates, and the king might appoint whom he pleased as delegates; he might appoint the whole commission if he chose, from the judges of the common law. *Com. Dig., Prerogative, (D.* 14). And in the exercise of its discretion, the Court of Chancery would either grant a full commission of delegates, that is to lords spiritual and temporal, judges of the common law and civilians, or one to judges and civilians only. When the jurisdiction of bishops was in controversy, or a question depending that concerned the canon and ecclesiastical law, a full commission was granted. When it was altogether a matter of law, as a question on a will, a commission issued to judges and civilians only. 1 *Williams on Ex'rs* 446, *note (p.).* And this was declared to be the practice by Lord Hardwicke in *Ex parte Hellier,* 3 *Atk.* 798.

The Prerogative Court in this state owes the finality of its decrees, neither to its peculiar organism, nor to constitutional provision, but wholly to legislative enactment, (*Rev. Laws* 776); and there is therefore nothing in that attribute of the court which inhibits legislative interference.

But if such appeal had not been entertained in England, the answer is obvious. If those ecclesiastical courts which had appellate jurisdiction had been adopted into our judicial system, and continued under the new Constitution, the argument would have great weight. But the fact that the power of the Ordinary and the Prerogative Court, which existed separately under the English system, have been blended here, and no ecclesiastical court of appellate jurisdiction provided, repels the presumption which otherwise might have arisen, and points strongly to the opposite inference. With equal force it might be argued that the legislative acts which give to the Ordinary powers unknown to the ecclesiastical courts, such as the act concerning drunkards, and others of like character, are void, because the framers of the Constitution could never have intended that the Ordinary

should possess functions which the ecclesiastical courts never exercised in England.

There is no difficulty suggested by pl. 5, section 2 of Article IV, in reference to the question whether the Chancellor could sit on the hearing of this appeal, for that clause clearly excludes him in every case of appeal, from sitting or having a voice in the hearing or final decree.

The motion to dismiss the appeal must, for the reasons expressed, be denied.

THE CHANCELLOR, dissenting.

The question here is, whether the act of 1869, granting an appeal from the Prerogative Court, is constitutional. Courts will not declare an act of the legislature unconstitutional, unless it is shown to be so, clearly and free from all reasonable or serious doubt. It is not necessary that it should be expressly prohibited by positive words in the Constitution. Most of the cases in which acts have been declared void, as prohibited by the Federal or State Constitutions, are those in which they were held to be contrary to the intent and object declared, by a fair construction of the instrument. The legislature seldom or never intends to violate the Constitution, and therefore few cases can arise in which their action is prohibited by its express words.

But, beyond this requirement that the case should be free from reasonable doubt, courts should have no leaning or intendment either way. The Constitution is the act of the people of the state. They adopt it directly; it is almost the only act in the formation or conduct of the government that they directly perform. By it they determine how much of their natural rights they are willing to surrender, and how much power over themselves they are willing to place in others, to form an efficient government. In proportion to the rights reserved the nation is free; if all are surrendered, the government is despotic; and this, whether the power is delegated to one, or to a number. The judiciary is the

branch of government to whom it is entrusted to determine whether the legislative branch has exceeded the powers delegated to it. And there is no reason why it should side with despotism against freedom, with usurpation against the plain reservation of rights and powers to the people themselves, or why it should combine or conspire with a co-ordinate branch for that purpose, when it is the only guard or balance wheel by which such excess can be kept in check.

In this case, the people of New Jersey have retained the creation and change of the six principal courts to themselves. It is a power not necessary to make the legislature an efficient government, but can be exercised by the people conveniently. It needs no haste ; and it is perhaps better that such change cannot be made to suit the emergency of every cause that may arise. Beyond the requirement that the unconstitutionality should plainly appear, there ought to be no leaning or intendment.

There are here two questions : First, whether the Constitution directly authorizes an appeal from the Prerogative Court to the Court of Appeals. If it does, the act of 1869 is valid. But if the Constitution does not authorize it, as there is no prohibition against conferring additional power on any court, unless so far as the powers of the other courts are infringed on, the second question will arise, whether this act infringes on the powers of the Prerogative Court.

The Constitution divides the powers of government into three distinct departments, the legislative, judicial, and executive. It then declares that : " The judicial power shall be vested in a Court of Errors and Appeals in the last resort in all causes, *as heretofore ;* a court for the trial of Impeachments ; a Court of Chancery ; a Prerogative Court; a Supreme Court; Circuit Courts ; and such inferior courts as now exist, and as may be hereafter ordained and established by law ; which *inferior courts* the legislature may alter and abolish as the public good may require."

Before that Constitution, the Court of Appeals had never been authorized to hear appeals from the Prerogative Court,

and if the words "as heretofore," are to be considered as applying to the jurisdiction, or as qualifying the words "all causes," to which they are joined, then it is conceded that this court was not by the Constitution empowered to entertain appeals from the Prerogative Court. This is the natural and proper application of these words, as they stand in this sentence; they qualify the extent or universality of the words "all causes," and limit them to such causes · as were before subject to appeal. These words cannot be rejected because they contradict or limit the preceding words, any more than the words "of full age," after the words "every white male citizen," in the suffrage clause. In fair and natural construction, such phrase at the end of a sentence may be applied to the whole sentence as well as to the last words; such construction might, with propriety, be given in the parallel clause in the old Constitution, were it not that it would make the clause untrue. The court had never before been one of the *last resort;* it had always been subject to an appeal to the king in council. But here such application is impossible; it was not intended, as such reading would imply, to vest the whole judicial power in this court, nor was it so vested "theretofore." It could not be applied either to the name or constitution of the court, for both were essentially changed, and were not "as theretofore." It could not be transposed so as to come after the words 'last resort'; in part, because it would make the clause assert that the court was of the last resort before then in all cases, which is not true; in part, because this construction is based upon the claim, that this phrase was copied from the old Constitution, and must have the same application as there, to the words "in the last resort," yet under that Constitution it never was a court of the last resort, but an appeal from it always existed to the king in council, reserved in Lord Cornbury's instructions, (*L. & S.* 641); but mainly because such arbitrary ·transposition of words for the purpose of giving a desired meaning, is never allowed in any system of interpretation.

Transposition of words has been allowed, but only in cases where the intention plainly expressed in other parts of the instrument, requires it to confirm that intention, and then not in such manner as to destroy the plain meaning of any sentence; and it is a mode of interpretation always of doubtful propriety. In the constitutional provision "that bills for revenue shall originate in the Assembly, but the Senate may propose amendments," it would never be allowed for any purpose to transpose the words "Senate and Assembly," so as to reverse their powers. The promise of the Saviour to the penitent thief, "I say unto thee this day thou shalt be with me in Paradise," may have its meaning changed both as it stands in the original, and in the translation, by a change of punctuation which is admissible, as that is the work of translators or printers. But if had been written "thou shalt be this day with me in paradise," a transposition so as to read, "I this day say unto thee," could never have been ventured on even by Pope or Ecumenical Council, although necessary to sustain the whole realm of purgatory. Any transposition in this case seems equally unwarrantable.

But if it was a case in which transposition was admissible, there is nothing to require it. The other provisions of the instrument show, on the contrary, that this clause was intended to operate as it reads, and thus alone will be in harmony with its other provisions; the last sentence of the first paragraph of the 10th Article, directs that these courts should continue, except as therein otherwise provided, with their former powers and jurisdiction. This indicates a general intention that the powers should remain unaltered. The special provision for writs of error from the circuits to this court would be entirely unnecessary, if the words creating this court gave it appellate jurisdiction over all courts, and clearly shows that the only jurisdiction understood to be conferred on this court was in such causes as it before had jurisdiction to hear. The provisions of pl. 5 and 6, in section 2 of Article VI, also show that such was their understanding.

The situation and past history of the Prerogative Court renders it probable that that body of lawyers of learning and eminence, the elite of the bar of the state, who formed so large a part of that convention, and were, without doubt, both active and influential in adjusting the arrangement of the courts, meant by this clause what is expressed in it.  In England, the proof of wills and granting of administrations, and the business connected with them, and in fact almost all matters now within the jurisdiction of our Prerogative Court, had been, for centuries, entrusted to the ecclesiastical courts.   When England separated from the See of Rome, this jurisdiction, by the statute of 23 *Henry VIII*, was declared to be in the bishop, or ordinary of the diocese, and in cases of goods within two dioceses, in the archbishop. The bishops exercised this jurisdiction by an official, called his Chancellor, and sometimes called the Ordinary; the archbishop, by an official called the judge of the Prerogative Court, a name derived from the fact that jurisdiction in such cases was by the archbishop's prerogative.   An appeal was allowed from the Ordinary to the Prerogative Court, whose sentence was without appeal.  But a statute of the next year, 24 *Henry VIII*, ch. 12, gave an appeal to the king in chancery, which was heard before delegates appointed under the great seal, who were called the Court of Delegates.   Some of these, as well as the officials of the bishop and archbishop, were always doctors of the civil law. No appeal ever was given to the law courts, either to the Exchequer Chamber or the House of Lords.   Under the proprietary government, their governor entertained this testamentary jurisdiction.   This appears by the records in the office of the Secretary of State.   Upon the surrender in 1702, the Queen, in the commission to Lord Cornbury, (*L. & S.* 651) gave him full power to erect and establish courts, but in his instructions (*L. & S.* 639) subjected the colony to the ecclesiastical jurisdiction of the Bishop of London, except the collating to benefices, granting licenses for marriages, and the probate of wills, which was reserved to

the governor for the time being. Until the Revolution, this power continued in and was exercised by the governor. And although the instructions to Cornbury, (*L. & S.* 641), created him and his council the Court of Appeals, no appeal was ever given from the governor's testamentary proceedings, except the appeal which existed from all the highest colonial courts to the king in council. At the Revolution, the Constitution of 1776 declared the governor to be Ordinary and Surrogate-General, and declared that he and the council should be the Court of Appeals in the last resort in all causes of law, "as heretofore." This had never been construed to give appeals from the Ordinary, and the legislature had never provided for taking such appeals. Until then, either in England or this country, no appeal had ever been given, or been had from the Prerogative or Testamentary Courts to the Courts of Appeal in cases of law or equity. And it is not probable that this body of experienced and conservative lawyers intended to introduce such innovation; and if they did so intend, it is hardly conceivable that they would have attempted it without expressing it in words that were prominent, and could not be mistaken, especially that they would do it by words seeming to say that no innovation was intended. Above all, they would not have used the very words that had created the doubt under the old Constitution, and have changed the sentence so as to increase that doubt. They must have known of the doubt and controversy stated in 4 *Griff. Reg.* 1179; that book was in the hands of all.

What the convention intended, if it was not expressed, should never be allowed to control the meaning of the words they have used; but when it is claimed that they intended something different from what is expressed, facts which show that their intention could not have been other than that expressed, are a full answer to the claim.

If this construction is correct, the Constitution did not give this appeal. But as the legislature may confer additional powers on any constitutional court, the act of 1869 is

valid, unless it infringes on the power of the Prerogative Court.

The first section of the 10th Article provides, that "the several courts of law and equity, except as herein otherwise provided, shall continue with the *like powers* and jurisdiction, as if this Constitution had not been adopted." These words are not to be construed in a strict technical sense, as if it read courts of common law, but must include all courts which administer either testamentary or common law. This but affirms positively the plain implication to be derived from the other provisions regarding the courts named as the judicial power of the state, that the legislature cannot interfere with their existence or diminish their power. The special provision that certain equity powers may be conferred on circuit courts for foreclosure, is another confirmation.

The only question then is, does subjecting the Prerogative Court to an appeal, detract from or diminish its powers? It makes it at once an *inferior court;* it subjects it to the Court of Appeals, and takes from it the power of making a final decision in any case. The power of determining all causes, or a certain class of causes, without appeal, is the very summit of judicial power. It is the same question, as whether it would detract from the power of a legislature before uncontrolled, to place over it an absolute veto, or whether it diminishes the power of a sovereign, to give a parliament power to reject his edicts. To state the question is to answer it. The convention deemed it necessary to provide for writs of error from circuits, and to prohibit writs of certiorari to Orphans' Courts, and therefore must have considered the right of appeal as one of those fixed by the Constitution.

By the same reasoning that would sustain this law, the Supreme Court or the Court of Chancery, may be made subject to an appeal to the circuit, or one of them to the other.

But this whole question has been before decided in this court, and is *res adjudicata.* In the case of *Anthony* v. *Anthony,* 1 *Halst. Ch.* 627, a direct deliberate decision was

made on this very point. It was an appeal from the Prerogative Court to this court, on a matter of dower; the 7th section of the act of 1820, had given such appeal from the Orphans' Court. That act was still in force; it was repealed by the act of April 16th, 1846, and is No. 149 in the repealing section, (*Rev. Stat.* 683), which did not take effect until February 1st, 1847. This cause was decided in April Term, 1846; the old Constitution was abolished, and the new one in force. Neither provided for such appeal; it was made in 1843, under the old Constitution. That was not so stringent against it as the new. The Prerogative Court was not positively protected by it as in the new. The dismissal, as appears by the report and by the rule granted to show cause, was on the ground of jurisdiction. The records show that there was no want of prosecution, or other reason for dismissal. The note to the case, whether by Chancellor Halsted or the reporter, shows that such was understood to be the ground of the decision, for it ingeniously suggests a case which might be beyond the reason for such decision.

Of the twelve judges who heard the cause, six were members of the constitutional convention held within two years. All the court concurred in the dismissal, except Chancellor Halsted, who declined to vote. The appeal had been taken by a prominent member of the convention, one who would not have deserted his client if he thought the appeal sustainable, any more than he would have endeavored to sustain it if he thought it clearly unconstitutional; he did not resist the application. The motion was made by another prominent member of the convention, who based it on the want of jurisdiction, and contended that under the new Constitution his case was stronger than under the old. Both counsel had just risen from their labors as revisers of the whole statute law, and one week before this the legislature had passed the dower act of 1820, with the appeal section stricken out by the commission, and it cannot be doubted, stricken out because they thought it unconstitutional.

In the case of *Hillyer* v. *Schenck*, 2 *McCarter* 501, a

similar appeal was dismissed by this court for want of juris-
diction. And I think, taking the whole case together, that
the inference is fair, that the want of jurisdiction was based
on the want of constitutional power.

If there is authority in judicial decision, these should
bind this court on this question. The first was made near
the time of the adoption of the Constitution, and by men
who were concerned in framing it. And if there is any
force in the maxim *contemporanea expositio fortissima est,*
it should be regarded here.

The revisers finished their work without provision for
such appeals. One part of their duty was to adapt the
statute law to the new Constitution. If that gave this ap-
peal, the omission was as gross, though not so mischievous,
as to have left the writ of habeas corpus of no avail for
want of provision by whom and when it should be granted.
Twenty-four successive legislatures have been guilty of the
same neglect. Except in a plain case, we should not arrive
at a conclusion involving such results, even to perform that
pleasant duty of a good judge, *ampliare jurisdictionem.*

The appeal from chancery granted under the old Consti-
tution, may be explained by the fact that this Constitution
was not viewed as restricting the legislature. It expressly
vested in the legislature, not the legislative power, but the
" government of the province." That of course included
the power of making or changing a Constitution. And the
provision which it contained, that each legislator should
take an oath not to assent to any law which would annul or
repeal three specified sections, implies both power and per-
mission to repeal at pleasure, all other sections. Under this
view, the legislature changed entirely the elective franchise,
and the very style and name of the government, and many
other provisions. Had the Constitution been unalterable, it
did not create the Court of Chancery, or recognize its exist-
ence at all, much less in such way that the legislature had
not power to abolish it, or change its jurisdiction, by adding
or taking away. The Prerogative Court was in the same

situation. These courts, and in fact any court except the Court of Appeals, were not established or continued by the Constitution of 1776. The provision that the common law and statutes then in force should continue in force, did not continue them. Their existence did not depend on statutes, but the ordinances of the royal governors, which fell with the Revolution. It was found necessary to supply this defect by the act of October 2d, 1776, (*Pat. Rev.* 38). These courts, whose existence depended on that statute, could of course be changed or abolished by like legislation. This power the legislature freely exercised. The Constitution of 1844 has changed this; it was intended to change it.

So far as the question under consideration is concerned, I am gratified at the result to which the majority have arrived, although I cannot concur in it. The subject matters of the jurisdiction of the Prerogative Court are too important to be submitted to any single judge, without appeal. It is an anomaly in our jurisprudence, and with the elements of both courts as now constituted, there remains nothing of the reason that once existed, for not giving the appeal to the appellate courts in law and equity cases.

The question being whether the appeal should be dismissed, the vote was as follows:

*For dismissal*—ZABRISKIE, C., VAIL. 2.

*Contra*—BEASLEY, C. J., BEDLE, CLEMENT, DEPUE, KENNEDY, OGDEN, OLDEN, SCUDDER, VAN SYCKEL, WALES. 10.