## ALLEN SZARWAK *v.* WARDEN, CONNECTICUT CORRECTIONAL INSTITUTION, SOMERS

HOUSE, C. J., SHAPIRO, LOISELLE, MACDONALD and BOGDANSKI, JS.

Argued June 7—decision released July 23, 1974

*John F. Mulcahy, Jr.,* deputy chief state's attorney, with whom were *Robert E. Beach, Jr.,* and *Richard R. Brown,* assistant prosecuting attorney, for the appellant (defendant).

*Leonard I. Shankman,* for the appellee (plaintiff).

*Richard R. Stewart* filed a brief as amicus curiae but did not argue the case.

House, C. J.   This appeal is from a judgment rendered on the plaintiff's amended petition for a

writ of habeas corpus. The pertinent facts are not in dispute. The plaintiff was initially charged in the Circuit Court with fourteen counts, seven charging the receipt of stolen credit cards and seven charging the receipt of stolen property. By a substituted information, he was charged with a single count of receiving stolen credit cards and one count of receiving stolen property in violation of §§ 53a-128c (e) and 53a-125 of the General Statutes, respectively. The plaintiff, represented by a public defender, entered pleas of not guilty to both counts and elected a jury trial which commenced on May 17, 1973. The following day, after several of the state's witnesses had testified and the state had presented approximately half of its case, the prosecutor and the public defender entered into plea bargaining negotiations. Immediately thereafter the prosecutor nolled the second count, and the plaintiff pleaded guilty to the one count of receiving stolen credit cards in violation of § 53a-128c (e) of the General Statutes, a class D felony punishable under the penal code by a maximum sentence of five years' imprisonment or a $5000 fine or both. See General Statutes §§ 53a-35 (b), 53a-41.

The prosecutor informed the trial court that the guilty plea was a result of an agreement reached by plea negotiations, the terms of which were a recommended sentence of not less than one year's nor more than two years' imprisonment, to be served concurrently with the balance, if any, of a prison term which the plaintiff might have to serve owing to a parole violation. The public defender added nothing to the prosecutor's representation of the terms of the agreement. The trial court thereupon conducted an extensive and exhaustive inquiry into the voluntariness of the guilty plea, asking the plain-

tiff if he understood the nature and the essential elements of the charge to which he had pleaded guilty and if he understood that the maximum penalty which could be imposed was five years' imprisonment or a possible $5000 fine or both; that the court was not bound by the prosecutor's recommendation; that the plaintiff could not be compelled to make an incriminating statement or to take the stand and testify; that he had a right to plead not guilty, to remain silent, and to confront and cross-examine the state's witnesses; and that if he pleaded not guilty, he had a right to a speedy and public trial by a jury or judge at which he would be presumed innocent until the state, by competent evidence, established his guilt beyond a reasonable doubt. In response to each one of these questions, the plaintiff expressly answered in the affirmative. The trial court asked him if his guilty plea was induced by any threats or promises. The plaintiff replied that it was not. The plaintiff was asked again if he understood that the court was not bound by the agreed-upon recommendation by the prosecutor or by any other recommendation which the prosecutor or the probation officer might make with respect to the disposition of his case. He answered that he understood. The court then further specifically informed him that even though the prosecution recommended a sentence of from one to two years' imprisonment to run concurrently with a term resulting from parole violation, the court, nevertheless, was not bound in sentencing either to accept the duration of the agreed-upon sentence or to make the sentence concurrent with his confinement for violation of parole. To each explanation stated separately, the plaintiff replied that he understood. The court then inquired as to

the sentence on the earlier charge, and the plaintiff stated that it was two to nine years for burglary, and that the unserved portion of it was five years.

The trial court then began an inquiry into whether there was a factual basis for the guilty plea, particularly pursuing the matter of the plaintiff's knowledge of the incriminating evidence found in his apartment. The trial court deferred a decision on acceptance of the plea until the plaintiff could confer privately with the public defender. During the recess, the public defender told the negotiating prosecutor that the plaintiff was concerned that the judge might impose a sentence greater than the one recommended and inquired what would happen in that event. The prosecutor replied that if that occurred, the state would not oppose a motion to withdraw the guilty plea.

After the court reconvened and after further inquiry by the court during which the plaintiff acknowledged seeing the stolen credit cards in his dresser drawer, the court determined that there was a factual basis for the charge to which the plaintiff wished to plead guilty. After a further extremely detailed inquiry into the facts constituting the crime and the state's proof thereof, and after again asking the plaintiff if he still wished to plead guilty, the court, after the plaintiff answered affirmatively, accepted the guilty plea. When asked if he had anything further to say, the plaintiff replied: "No sir, that's all."

The court made an express finding that the plaintiff fully understood the charges and the consequences of his plea; that he fully understood his constitutional rights, his right to engage counsel,

his right to a trial and his right to confront his accusers; that he acted voluntarily in changing his plea to guilty; and that there was a factual basis for the charges to which the plea of guilty was entered.

After the plea of guilty was entered and accepted on May 18, 1973, the case was continued for a pre-sentence investigation. At the sentencing hearing on June 15, 1973, which was held before the judge who had accepted the plaintiff's guilty plea, the prosecutor who negotiated the plea of guilty was unable to appear and another prosecutor took his place. At the outset of the hearing, the prosecutor recommended the agreed-upon sentence. The plaintiff then moved to withdraw his guilty plea, stating as reasons therefor several grounds hereinafter discussed.

The court again explained to the plaintiff that on May 18 it had informed him that the court was not bound by the recommendation, and that it had a presentence investigation and report to assist it in making its decision as to a proper sentence in the case. The public defender told the court that the negotiating prosecutor was not objecting to a withdrawal of the plea at any time, even at sentencing. The sentencing prosecutor stated that while his basic reaction was to object to the withdrawal, he was not present during the plea negotiations, was not familiar with the discussions, and would forgo any comment whatsoever for those reasons. The sentencing prosecutor assumed that the agreement with respect to the withdrawal of the guilty plea became operative only if a motion to withdraw was made after sentence was imposed. The court denied the plaintiff's motion to withdraw the guilty plea

and imposed a sentence of not less than eighteen months nor more than three years concurrent with any parole violation time on the prior sentence. The sentencing judge stated that he felt that the plaintiff needed more than a one-year minimum sentence for the psychiatric treatment expressly requested by the plaintiff and recommended by the probation officer and the public defender. After the court imposed the sentence, neither the plaintiff nor the public defender asked that the plaintiff be allowed to withdraw the guilty plea. After the plaintiff started to serve his sentence at the Connecticut correctional institution at Somers, he filed the petition for a writ of habeas corpus, the judgment on which gave rise to this appeal.

Following the hearing on the plaintiff's petition in the Superior Court, that court concluded that because a motion to withdraw the guilty plea was made and the plaintiff did receive a sentence exceeding the prosecutor's recommendation, the state had breached its agreement by objecting to the motion. The court concluded that since the agreement reached through the plea negotiations was breached, the remedy must be either specific performance of the agreement or a withdrawal of the guilty plea. See *Santobello* v. *New York,* 404 U.S. 257, 263, 92 S. Ct. 495, 30 L. Ed. 2d 427. Since the court also concluded that the Circuit Court could not constitutionally impose the recommended sentence, it ordered that the plaintiff be discharged from custody unless the Circuit Court vacated the conviction and erased the guilty plea.

The Superior Court certified the defendant's appeal to this court in accordance with the provisions of § 52-470 of the General Statutes. Both

parties thereafter joined in a motion that, as permitted by § 762 of the Practice Book as amended, this court expedite a hearing of the appeal, which the parties represented would be ready for hearing at the next term of this court. Their joint motion was granted.

The defendant's first claim of error is addressed to the Superior Court's conclusion that there was a breach of the terms of the plea bargain necessitating the setting aside of the conviction entered on the guilty plea.

In recognition of the importance of plea bargaining in the administration of criminal justice, the United States Supreme Court has observed that the "[d]isposition of charges after plea discussions is not only an essential part of the process but a highly desirable part for many reasons. It leads to prompt and largely final disposition of most criminal cases; it avoids much of the corrosive impact of enforced idleness during pretrial confinement for those who are denied release pending trial; it protects the public from those accused persons who are prone to continue criminal conduct even while on pretrial release; and, by shortening the time between charge and disposition, it enhances whatever may be the rehabilitative prospects of the guilty when they are ultimately imprisoned. See *Brady* v. *United States,* 397 U.S. 742, 751–752 [90 S. Ct. 1463, 25 L. Ed. 2d 747] (1970)." *Santobello* v. *New York,* supra, 261.

For an accused, a plea of guilty constitutes a simultaneous waiver of numerous constitutional rights, including the right to a trial by jury, the right to confront and cross-examine one's accusers, and the privilege against self-incrimination. *Boy-*

*kin* v. *Alabama,* 395 U.S. 238, 243, 89 S. Ct. 1709, 23 L. Ed. 2d 274; *Parker* v. *North Carolina,* 397 U.S. 790, 800–801, 90 S. Ct. 1458, 25 L. Ed. 2d 785; *McCarthy* v. *United States,* 394 U.S. 459, 466, 89 S. Ct. 1166, 22 L. Ed. 2d 418; *State* v. *Bugbee,* 161 Conn. 531, 533–34, 290 A.2d 332. The adjudicative element inherent in accepting a plea of guilty must, accordingly, be surrounded by safeguards, and the record must affirmatively disclose that a defendant who pleaded guilty entered his plea understandingly and voluntarily. *Consiglio* v. *Warden,* 160 Conn. 151, 162, 276 A.2d 773; *Boykin* v. *Alabama,* supra, 242; *State* v. *Bugbee,* supra, 536. For these reasons the United States Supreme Court, in *Santobello* v. *New York,* supra, 262, has also held that "a constant factor" in "[t]his phase of the process of criminal justice" is that "when a plea rests in any significant degree on a promise or agreement of the prosecutor, so that it can be said to be a part of the inducement or consideration, such promises must be fulfilled."

Generally, there are three prosecutorial concessions that may be made in a plea agreement. First, the charge may be reduced to a lesser or related offense. Second, the prosecutor may promise to nolle prosequi other charges. Third, the prosecutor may agree to recommend or not to oppose the imposition of a particular sentence. A.B.A. Standards Relating to Pleas of Guilty (Approved Draft, 1968) § 3.1, Commentary at 66; note, "Guilty Plea Bargaining: Compromises by Prosecutors to Secure Guilty Pleas," 112 U. Pa. L. Rev. 865, 898; cf. *Brady* v. *United States,* supra, 751; note, "Criminal Procedure—Requirements for Acceptance of Guilty Pleas," 48 N.C. L. Rev. 352, 359–60.

Here the plaintiff's guilty plea was entered after plea negotiations as a result of which the prosecutor nolled one count and agreed to recommend and did, in fact, recommend a sentence of one to two years' imprisonment to run concurrently with any portion of a prior sentence that the plaintiff might be required to serve as a result of a violation of parole. That the prosecutor completely complied with this agreement is not questioned. What the defendant does attack by his assignment of errors is the conclusion of the court that "[b]ecause a motion to withdraw was made and the petitioner did receive a sentence exceeding the recommendation, the state breached its agreement by objecting to the motion." It followed from this conclusion that the court, upon the authority of *Santobello* v. *New York*, supra, reached the further conclusion that "[t]he breaking of a promise made by the prosecutor as a result of plea negotiations is sufficient to invalidate a conviction."

Both of these conclusions have been attacked by the defendant on the grounds that the facts set forth in the finding do not legally or logically support them and that they involve an erroneous application of the law. Our examination of the facts found by the court discloses that there is merit to these assignments of error, and that the facts found by the court do not support its conclusion that the prosecutor in the Circuit Court did in fact breach the plea bargaining agreement.

The basic conclusion of the court was as follows: "The agreement entered into by the negotiating prosecutor and the petitioner was that a one to two year sentence would be recommended, that the state would nolle the second count of the substituted

information, and that the state would not object to a motion to withdraw the plea *if* the judge should sentence in excess of the recommendation." (Emphasis supplied.) While the court did impose a sentence in excess of the recommendation, the plaintiff did not, after the happening of that condition, move to withdraw his guilty plea, and, accordingly, the prosecutor had no occasion to object to a non-existent motion to withdraw the guilty plea and made no such objection. The conclusion of the court that the state breached its plea bargaining agreement is not supported by the unattacked subordinate facts which the court found[1] and was reached erroneously. In the absence of such a breach and failure on the part of the prosecution to fulfill a promise made in a plea bargaining agreement, the rule enunciated in *Santobello* v. *New York,* supra, has no application, and the court erred in following the dictates of that case and ordering

---

[1] Relevant subordinate facts found by the court include the following:

"The only circumstance in which the state would not oppose withdrawal was, according to the subsequent agreement, where the sentence recommendation was not followed by the sentencing court."

. . . . .

"It was the custom of the negotiating prosecutor not to oppose motions to withdraw when the sentencing judge exceeded the agreed recommendation."

. . . . .

"The sentencing prosecutor first became aware of the fact that the judge wasn't going to follow the recommendation when the judge actually pronounced the sentence."

. . . . .

"Up to the time that the court sentenced petitioner, the sentencing prosecutor had no knowledge that the judge would not accept and follow the agreed recommendation."

that the plaintiff be discharged from custody unless the Circuit Court vacated the conviction and erased the guilty plea.

Even assuming that the second prosecutorial concession amounted to "a *Santobello* promise, one that 'can be said to be part of the inducement or consideration'"; *United States* v. *Lombardozzi,* 467 F.2d 160, 163 (2d Cir.), cert. denied, 409 U.S. 1108, 93 S. Ct. 907, 34 L. Ed. 2d 688; and even assuming that the fulfillment of the original agreement did not, as the state claims, amount to substantial compliance with the terms of the bargain; e.g., *X* v. *United States,* 454 F.2d 255, 261 n. (2d Cir.), cert. denied, sub nom. *Jones* v. *United States,* 406 U.S. 961, 92 S. Ct. 2073, 32 L. Ed. 2d 348; there could be no breach of the agreement where there was no motion to withdraw the plea after the sentence was imposed since a sentence in excess of that recommended was a condition precedent. We find that in the absence of an unfulfilled promise calculated to induce the plaintiff's guilty plea, the Superior Court erred in finding the decision in *Santobello* applicable to this case.

There remains the question whether the court erred in denying the plaintiff's motion to withdraw his guilty plea made prior to sentencing. The burden of proving merit for his reasons for withdrawing a plea of guilty rests on the moving party. *United States* v. *Webster,* 468 F.2d 769, 771 (9th Cir.), cert. denied, 410 U.S. 933, 93 S. Ct. 1384, 35 L. Ed. 2d 596; *United States* v. *Lester,* 247 F.2d 496, 501 (2d Cir.); *United States* v. *Rogers,* 289 F. Sup. 726, 729 (D. Conn.); note, 6 A.L.R. Fed. 682; see *Williams* v. *Reincke,* 157 Conn. 143, 147, 249 A.2d 252; cf. *Dukes* v. *Warden,* 406 U.S. 250, 257–58,

92 S. Ct. 1551, 32 L. Ed. 2d 45. The plaintiff stated that his reasons for wishing to withdraw his guilty plea were that he felt his earlier preliminary motion to suppress was not properly handled; that he did not feel a memorandum of law which he had submitted in conjunction with his attorney's memorandum in support of that motion was considered by the court; that his guilty plea was entered out of fear of receiving an additional five years for the parole violation and in anticipation of the court's acceptance of the recommended sentence; and that it was his understanding that the court was bound by the prosecutor's recommendation notwithstanding the earlier explanations by the court that it was not bound. The plaintiff said that he could not "quote the source" of his understanding.

A guilty plea is not invalid "whenever motivated by the defendant's desire to accept the certainty or probability of a lesser penalty rather than face a wider range of possibilities extending from acquittal to conviction and a higher penalty authorized by law for the crime charged." *Brady* v. *United States,* 397 U.S. 742, 751, 90 S. Ct. 1463, 25 L. Ed. 2d 747. A plea of guilty, voluntarily and knowingly made, waives all nonjurisdictional defects and defenses in the proceedings preliminary thereto. *Williams* v. *Reincke,* supra, 147; 21 Am. Jur. 2d, Criminal Law, § 495; see note, 20 A.L.R.3d 730. "When a criminal defendant has solemnly admitted in open court that he is in fact guilty of the offense with which he is charged, he may not thereafter raise independent claims relating to the deprivation of constitutional rights that occurred prior to the entry of the guilty plea." *Tollett* v. *Henderson,* 411 U.S. 258, 267, 93 S. Ct. 1602, 36 L. Ed. 2d 235.

The recently adopted Rule 11 (e) (4) of the federal Rules of Criminal Procedure requires that in the federal courts a trial judge must inquire of a defendant whether a withdrawal of a guilty plea is desired when the judge intends to impose a sentence in excess of the one recommended. See 52 F.R.D. 415; see also Illinois Supreme Court Rule 402 (d) (2) [52 F.R.D. 429], and Pennsylvania Crim. Proc. Rule 319 (b) (3), *Commonwealth v. Barrett,* 223 Pa. Super. 163, 299 A.2d 30; *Cacilhas v. Superior Court,* 35 Cal. App. 3d 465, 110 Cal. Rptr. 661, 665; A.L.I. Model Code of Pre-Arraignment Procedures (Tentative Draft No. 5, 1972) §§ 350.5 (4), commentary at 112; A.B.A. Standards Relating to Pleas of Guilty (Approved Draft, 1968) §§ 2.1 (a) and 3.3 (b); cf. *United States v. Gallington,* 488 F.2d 637, 640 (8th Cir.). There is no comparable rule or requirement in Connecticut.

"This court has never attempted to lay down specific guidelines for the assistance of a trial court in deciding the merits of an application to withdraw a plea in a criminal case. Indeed, since of necessity each case must depend on its own facts and circumstances, it is doubtful that any hard and fast rule can be laid down which will fit every case. 22 C.J.S. 1142, Criminal Law, § 421(2). Many of the innumerable cases discussing the relevant considerations are collected in annotations in 20 A.L.R. 1445 and 66 A.L.R. 628, entitled 'Right to withdraw plea of guilty.'" *State v. Brown,* 157 Conn. 492, 495–96, 255 A.2d 612. We have repeatedly held that, once entered, a guilty plea cannot be withdrawn except by leave of the court, within its sound discretion, and a denial thereof is reversible only if it appears that there has been an abuse of discretion. *State v. Dennis,* 150 Conn. 245, 246, 188 A.2d 65;

*State* v. *Carta,* 90 Conn. 79, 82, 96 A. 411; *State* v. *Maresca,* 85 Conn. 509, 83 A. 635; *State* v. *Brown,* supra, 496. We have also stated that the court's discretion with regard to motions to withdraw a guilty plea, at least prior to sentencing, is to be exercised in favor of the accused. *State* v. *Brown,* supra; *State* v. *Carta,* supra. This was the general rule in the federal courts prior to the amendments to their Rule 11; see note, "Change of Plea—Before Sentence" 6 A.L.R. Fed. 665, 675; and in the United States Court of Appeals for the Second Circuit upon review of an application for federal habeas corpus by a state prisoner. *United States* v. *Follette,* 395 F.2d 721, 726 (2d Cir.); cf. note, "Withdrawing Guilty Plea after Sentencing," 9 A.L.R. Fed. 309, 323. " 'The plea of guilty is a solemn act not to be disregarded because of belated misgivings about the wisdom of the same.' " *United States* v. *Benson,* 469 F.2d 222, 223 (8th Cir.), quoting from *United States* v. *Woosley,* 440 F.2d 1280, 1281 (8th Cir.).

In this case the Circuit Court developed, on the record, an exhaustive inquiry into the voluntariness of the plea of guilty, its consequential impact, and the factual basis therefor. We conclude that there was no abuse of discretion in the court's denial of the motion to withdraw the plea. See *Williams* v. *Reincke,* 157 Conn. 143, 148–49, 249 A.2d 252; *United States* v. *Fragoso-Gastellum,* 456 F.2d 1287, 1288 (9th Cir.).

While we find error in the judgment of the Superior Court vacating the guilty plea entered by the plaintiff in the Circuit Court, this decision is not dispositive of the merits of this appeal. There remains for consideration the issue raised by the second count of the plaintiff's petition for habeas

corpus and a decision on this count is necessary for a determination of the validity of the sentence which was imposed on the plaintiff and which he is now serving.

In the second count of his petition the plaintiff pleaded the imposition by the Circuit Court of the sentence of not less than eighteen months nor more than three years for larceny in violation of § 53a-128 of the General Statutes. It is the plaintiff's claim that § 54-1a of the General Statutes, which gives to the Circuit Court jurisdiction over crimes punishable by a fine of not more than $5000 or imprisonment for not more than five years, or both, is unconstitutional in that it vests in the Circuit Court jurisdiction and power which materially detract from the essential characteristics of the Superior Court as created by § 1, article fifth, of the Connecticut constitution. The plaintiff contends that the General Assembly had no power to enact a statute or statutes giving such jurisdiction to the Circuit Court, and, accordingly, the statutes conferring such jurisdiction on the Circuit Court "are null and void and violate the constitution of the State of Connecticut and the United States of America particularly as to separation of power." By way of relief the plaintiff prayed for judgment that "Section 54-1a of the Connecticut General Statutes be declared unconstitutional insofar as it expands the jurisdiction of the Circuit Court to include crimes punishable by a fine of not more than Five Thousand ($5,000.00) or imprisonment for not more than five (5) years, or both"; and that "he be immediately released from custody and any restrictions imposed upon him pursuant to the judgment and sentence of June 15th, 1973."

The constitutional question of jurisdiction, now raised, clearly existed at the time of the disposition of the plaintiff's case in the Circuit Court, and no explanation is offered as to why it was not raised at that time. Several circumstances, however, prompt us to decide the question despite any irregularities in procedure. See *Collins* v. *York,* 159 Conn. 150, 155, 267 A.2d 668: "The question of the jurisdiction of a court to impose custody or restraint upon an individual is . . . a recognized basis for a collateral attack on the judgment of the court by habeas corpus." See also *Reed* v. *Reincke,* 155 Conn. 591, 594, 236 A.2d 909. As we have noted, the case below involved the sentence imposed on a negotiated plea of guilty, the validity of which plea was contested and has been hereinbefore adjudicated. The further question of the jurisdiction of the court to impose either the recommended sentence or the sentence it did impose was fully argued below, and, in accordance with the provisions of § 52-470 of the General Statutes, the appeal was certified to this court where it has been fully argued before us on facts concerning which there is no dispute. The issue not only involves a question of substantial importance and public interest, but its resolution is necessary to a proper final disposition of the appealed case.

The Superior Court wrote a lengthy and scholarly memorandum of decision, concluding that the constitutional claims of the plaintiff were meritorious and that "insofar as § 54-1a authorizes the Circuit Court to impose a sentence in excess of one year it is invalid." *Szarwak* v. *Warden,* 31 Conn. Sup. 30, 45, 320 A.2d 12.

Properly and responsibly, the defendant did not assign error to the conclusion of the court that "[i]t

was the intent of the constitution that Superior Court should continue with the essential characteristics it had previously possessed, and the legislature has no authority to deprive Superior Court of those essential characteristics." He properly narrowed the decisive issue on this aspect of the appeal by his assignment of errors directed to the court's conclusions that the expansion of the criminal jurisdiction of the Circuit Court has materially detracted from the essential characteristics of the Superior Court as envisioned by the constitution, and that, insofar as § 54-1a of the General Statutes authorizes the Circuit Court to impose a sentence in excess of one year, it is invalid.

The jurisdiction and the duty of this court to decide a question of the constitutionality of a legislative enactment cannot be doubted. The reasons are aptly set forth in the historic 1803 opinion by Chief Justice John Marshall in *Marbury* v. *Madison,* 5 U.S. (1 Cranch) 137, 177–78, 2 L. Ed. 60,[2] and as this court observed in the early case of *Trustees of*

---

[2] "It is emphatically the province and duty of the judicial department to say what the law is. Those who apply the rule to particular cases, must of necessity expound and interpret that rule. If two laws conflict with each other, the courts must decide on the operation of each.

"So if a law be in opposition to the constitution; if both the law and the constitution apply to a particular case, so that the court must either decide that case conformably to the law, disregarding the constitution; or conformably to the constitution, disregarding the law; the court must determine which of these conflicting rules governs the case. This is of the very essence of judicial duty.

"If, then, the courts are to regard the constitution, and the constitution is superior to any ordinary act of the legislature, the constitution, and not such ordinary act, must govern the case to which they both apply.

"Those, then, who controvert the principle that the constitution is to be considered, in court, as a paramount law, are reduced to the

*the Bishop's Fund* v. *Rider,* 13 Conn. 87, 93: "This court have [sic] also never failed, on all proper occasions, to assert and maintain the equally sound doctrine, that it is within their well established powers, and a part of their duties, to disregard a legislative act, which is clearly repugnant to the constitution of the United States, or of this state. *Atwater* v. *Woodbridge,* 6 Conn. Rep. 223. *Osborne* v. *Humphrey,* 7 Conn. Rep. . . . [335]. *Landon* v. *Litchfield,* 11 Conn. Rep. 251. *Derby Turnpike Co.* v. *Parks,* . . . [10] Conn. Rep. 522. To refuse the exercise of this high prerogative, in such cases, would be a gross dereliction of duty, and put the supreme law of the state or nation, under the controul of the legislature."

Again quoting Chief Justice Marshall: "The peculiar delicacy of this case, the novelty of some of its circumstances, and the real difficulty attending the points which occur in it, require a complete exposition of the principles on which the opinion to be given by the court is founded." *Marbury* v. *Madison,* supra, 154.

---

necessity of maintaining that courts must close their eyes on the constitution, and see only the law.

"This doctrine would subvert the very foundation of all written constitutions. It would declare that an act which, according to the principles and theory of our government, is entirely void, is yet, in practice, completely obligatory. It would declare that if the legislature shall do what is expressly forbidden, such act, notwithstanding the express prohibition, is in reality effectual. It would be giving to the legislature a practical and real omnipotence, with the same breath which professes to restrict their powers within narrow limits. It is prescribing limits, and declaring that those limits may be passed at pleasure.

"That it thus reduces to nothing what we have deemed the greatest improvement on political institutions, a written constitution, would of itself be sufficient, in America, where written constitutions have been viewed with so much reverence, for rejecting the construction."

The controlling provisions of the state constitution are found in articles second and fifth. Article second as contained in the constitution of 1818, and as it continues unchanged in the constitution adopted in 1965, provides: "The powers of government shall be divided into three distinct departments, and each of them confided to a separate magistracy, to wit, those which are legislative, to one; those which are executive, to another; and those which are judicial to another." Section 1 of article fifth of the 1818 constitution provided: "The judicial power of the state shall be vested in a supreme court of errors, a superior court, and such inferior courts as the general assembly shall, from time to time, ordain and establish: the powers and jurisdiction of which courts shall be defined by law." The 1965 constitution changed this provision by deleting the words "of errors" in the title of the Supreme Court, by changing the word "inferior" to "lower" in defining what courts could be established by the General Assembly, and by replacing the colon after "establish" with a period and the word "which" by the word "these." As thus changed, § 1 of article fifth now reads: "The judicial power of the state shall be vested in a supreme court, a superior court, and such lower courts as the general assembly shall, from time to time, ordain and establish. The powers and jurisdiction of these courts shall be defined by law."

The history of these constitutional provisions and their meaning have been the subject of several decisions of this court, and it would unduly lengthen this opinion to attempt to repeat here the results of the scholarly research and judicial wisdom of Justice William Hamersley in *Styles* v. *Tyler,* 64 Conn. 432, 30 A. 165; of Chief Justice William M.

Maltbie in *Walkinshaw* v. *O'Brien*, 130 Conn. 122, 32 A.2d 547; of Justice, later Chief Justice, Allyn L. Brown, in his dissenting opinion in the same case (p. 145); of Judge, later Justice, John A. Cornell, in *Osborn* v. *Zoning Board*, 11 Conn. Sup. 489; and of Chief Justice John Hamilton King in *Adams* v. *Rubinow*, 157 Conn. 150, 251 A.2d 49. Their full opinions are readily available in the Connecticut reports and it suffices here to summarize more briefly their findings and the conclusions of this court.

The opinion of Justice Hamersley in *Styles* traced at length the history of the adoption of our constitution with particular reference to the judicial articles. He noted (p. 444) that "[i]ndeed, there is no one of the States where the existing organization of courts and the language of the Constitution in relation to the judicial department can fairly be held analogous to our own." The circumstances peculiar to Connecticut include the significant fact that when the constitution was adopted in 1818, we already had a Supreme Court and a Superior Court with prescribed powers and jurisdiction. The Superior Court had been established in May, 1711, to supersede the Court of Assistants. 5 Col. Rec. 238-41 (Hoadly Ed.); see Preface, 1 Conn. xv. "In 1818 we had a judicial system peculiar to ourselves which was the growth of one hundred and eighty years." *Styles* v. *Tyler*, supra, 444. The General Court or Assembly originally exercised all political power; absolute power of legislation, supreme executive power and supreme judicial power in the administration and construction of all laws. Ibid. Over the years "[t]he Assembly had gradually delegated its judicial powers to the courts. It had built up a judicial system admirably

adapted to the needs of the people. But the jurisdiction and existence of the courts, as well as the tenure of office of the judges, was wholly dependent upon the action of each annual Assembly. To remedy this defect was one main object of the Constitution." Ibid. It was accomplished by the enactment of what was then and is now article second of the constitution, dividing the powers of government into three distinct departments: legislative, executive and judicial, each confided to a separate magistracy. By express provision in article fifth, the judicial power was, in 1818, and is now vested in the Supreme Court, the Superior Court and such lower courts as the General Assembly shall, from time to time, ordain and establish.

As Chief Justice King observed in *Adams* v. *Rubinow,* supra, 154: "In the period from 1818 until the decision in *Norwalk Street Ry. Co.'s Appeal,* 69 Conn. 576, 586, 37 A. 1080, in 1897, and in spite of the decision in *Brown* v. *O'Connell,* 36 Conn. 432, 446, there was a failure to appreciate the full import and application of article 2. See, for instance, *Wheeler's Appeal,* 45 Conn. 306, 315. But in the *Norwalk* case it was finally clearly determined that (1) the constitution represented a grant of power from the people, in whom all power originally resided, and (2) the powers granted to the General Assembly are legislative only and those granted to the judiciary are judicial only. Id., 592. But the legislative powers granted the General Assembly are complete except as restricted by the state or federal constitution, just as the judicial powers granted the judicial department are complete except as restricted by the state or federal constitution. *Patterson* v. *Dempsey,* 152 Conn. 431,

444, 207 A.2d 739. Any doubt as to the authority of the *Norwalk* case was set at rest in 1912 in *Bridgeport Public Library & Reading Room* v. *Burroughs Home,* 85 Conn. 309, 319, 82 A. 582, and its construction of article 2 has been followed consistently up to, and including, the present time, two of the more recent cases being *State Bar Assn.* v. *Connecticut Bank & Trust Co.,* . . . [145 Conn. 222, 231, 140 A.2d 863] and *Heiberger* v. *Clark,* 148 Conn. 177, 185, 189, 169 A.2d 652."

It is especially significant that unlike the judicial articles of most state constitutions and that of the United States constitution (article III), the powers and jurisdiction of the two courts specifically named in the Connecticut constitution (the Supreme and Superior Courts) are not specified. The reason is obvious. The 1818 constitution neither created nor provided for the creation of a new judicial system of new courts. Rather, it adopted and gave permanence in the constitution to the existence of the Supreme Court as the state's highest court of appellate jurisdiction and to the Superior Court as the trial court of general jurisdiction. Justice Hamersley summarized it thusly: "The Constitution of 1818 must be read in connection with this peculiar development and existing condition of our judicature, and in view of the special defects it was adopted to remedy; so read the provisions of the fifth article become clear and specific. The whole judicial power of the State is vested in the courts; that power is fully granted and is subject to no limitations except those contained in the Constitution itself; inferior courts may be from time to time ordained and established by the legislature in accordance with the public needs as developed by

future changes; and inferior courts are courts inferior to the Superior Court, exercising portions of that jurisdiction vested in the Superior Court, subject to such apportionment. Two courts are established and the character of their jurisdiction described by the Constitution itself; one with a supreme jurisdiction in the trial of causes, and one with a supreme and final jurisdiction in determining in the last resort the principles of law involved in the trial of causes. The 'Superior Court' is a 'Superior Court of Judicature over this State' with a supreme jurisdiction original and appellate over the trial of all causes not committed to the jurisdiction of inferior courts. The 'Supreme Court of Errors' is not a supreme court for all purposes, but a supreme court only for the correction of errors in law; if its jurisdiction also included the determination of facts it would then be supreme for all purposes and its name a misnomer. It cannot be claimed that the designation of these courts is a mere meaningless name with no effect whatever, and leaves the apportionment of jurisdiction to the uncontrolled discretion of the legislature; but if such claim is baseless, if the phraseology of the Constitution is descriptive of jurisdiction, then it clearly follows that the character of the jurisdiction so described must be sought in the meaning attached to the language used at the time is was employed by the people who used it for the purpose of such description." *Styles* v. *Tyler,* supra, 449–50.

Justice Hamersley's conclusions were later affirmed by this court in *Walkinshaw* v. *O'Brien,* 130 Conn. 122, 127, 32 A.2d 547: "The 'Superior Court' had been established in May, 1711, as a trial court of general jurisdiction and was in existence

when our constitution was adopted in 1818. 5 Col. Rec. 238; Statutes, 1808, p. 205. There can be no doubt that it was the intent of the constitution that this court should continue, with the essential characteristics it had previously possessed."

It does not appear that the changes in § 1 of article fifth made by the 1965 constitution were intended to alter, or did in any way materially change, the meaning of the judicial article. The redesignation of the "Supreme Court of Errors" to "Supreme Court" and the "inferior courts" to "lower courts" changed titles only and clearly effected no substantive alteration. Nor would we conclude that the separation of the final clause into a separate sentence and the substitution of "these" for "which" were anything more than minor changes in words and punctuation, effecting no change in substance or meaning.

In this connection it is of interest to note that in the draft of this section as first reported to the 1818 convention, this clause was also written as a separate sentence, a period dividing it from the preceding portion. Journal of the Constitutional Convention, p. 89. But in the final draft, and as the constitution was adopted, the period was replaced by a colon. Id., 111.

Our conclusion that the reversion in 1965 to the sentence structure proposed in the first 1818 draft was not intended to alter nor did alter the meaning of the section is confirmed by reference to the proceedings and actions of the 1965 constitutional convention. The convention was established by Public Act No. 1 of the November, 1964, Special Session of the General Assembly. Section 7 of that act

provided that the convention should prepare proposals to amend or revise the state constitution and file such proposals with the secretary of the state not later than November 1, 1965. The secretary of the state was directed within fourteen days of the receipt of such proposals to advertise them and distribute copies to the various town clerks "together with a resume of each to be prepared by the convention . . . ." The resume prepared by the convention as the statute directed and circulated by the secretary of the state made no reference whatsoever to any change in sentence structure in § 1 of article fifth and noted only the proposed deletion of "of Errors" and the change from "inferior" to "lower."

Similarly, the "Proposed Revised Constitution for the State of Connecticut, with Marginal Notes, Annotated and Published by the Constitutional Convention of 1965 as a Guide to the People of the State" indicated in the marginal note to § 1 of article fifth only the same two word changes, and made no reference to the change in sentence structure. The introduction to the "Guide" published by the convention carried this explanation: "The basic document is the Constitution of 1818. Into this framework are incorporated the changes in substance contained in the twelve resolutions adopted by the 1965 Convention as well as the twelve present amendments to the Constitution. The whole Constitution has been recodified. In many cases minor changes can be found in words and punctuation. These were made either to smooth the language, to clarify passages thought to admit of ambiguity, to remove unnecessary words and phrases or to achieve conformity of language in the whole. There are no marginal annotations for these changes.

Unless there are changes of substance in the proposed revision, notes will state 'no change' or 'as is.' "

Our conclusion is further confirmed by examination of the proceedings of the 1965 constitutional convention when the changes in § 1 of article fifth were adopted. The changes were incorporated in File No. 8, Constitutional Resolution No. 266. In the file copy of the resolution, the words "of Errors" were bracketed, the word "inferior" was bracketed followed by the word "lower" in italics, and the word "which" was bracketed followed by the word "these" in italics. No such indication of the change in punctuation from a colon to a period was given. In reporting for the Rules Committee and moving the adoption of the resolution, the only remarks were made by Mr. Tarpinian for the committee and his only comment as to § 1 was: "As understood by everyone, and I think there is no question about section 1 merely to correct the name of . . . the Supreme Court of Errors by removing the words 'of errors' and in referring to the Inferior Courts, because of the inference made by the word inferior, has changed that from 'Inferior' to 'Lower.' " Conn. Const. Conv., 1965, Proc. pt. 3, p. 763.

From the foregoing, we conclude that the 1965 constitution did not change § 1 of article fifth of the 1818 constitution in any matter of substance.

The significance of the clause as it read, or sentence as it now reads, was discussed in some detail in both *Styles* and *Walkinshaw*. It is not entirely free from ambiguity, and its full context must be kept in mind: "The judicial power of the state shall be vested in a supreme court, a superior court, and such lower courts as the general assembly shall,

from time to time, ordain and establish. The powers and jurisdiction of these courts shall be defined by law."

It is to be noted that although the General Assembly is expressly granted power to "ordain and establish" lower courts, there is no grant of power to the General Assembly to prescribe the powers and jurisdiction of any court. Instead, the powers and jurisdiction of the courts mentioned shall be "defined by law." This precise language is particularly noteworthy in the light of the provisions of the section which next followed § 1 of article fifth in the 1818 constitution. The substance of this section is now § 5 of article fifth, but as enacted as § 2 of article fifth of the 1818 constitution and as it read until the adoption of the tenth amendment in 1850, it provided: "There shall be appointed, in each county, a sufficient number of justices of the peace, with such jurisdiction in civil and criminal cases as the general assembly may prescribe." Not only was this language, in contrast to § 1, express authority for the General Assembly to prescribe jurisdiction rather than have it "defined by law" as in § 1, but, as the court in *Styles* noted (p. 453): "Here a free hand is given the legislature to confer on justices any jurisdiction whatever. Can the legislature appoint one or more justices in each county with supreme appellate jurisdiction in all causes civil and criminal tried within the county? This certainly cannot be; and cannot be because the phrase in section 2, as well as the phrase in section 1, is used in subordination to the jurisdiction of the Supreme Court of Errors and the Superior Court as granted and described." Indeed, the basic constitutional concept of separation of powers and the deposit of the judicial power in a magistracy sepa-

rate from that of the legislative is, as noted by Judge Cornell in *Osborn* v. *Zoning Board,* 11 Conn. Sup. 489, 526-27: ". . . itself a refutation of any constitutional intention that having gone to such lengths to keep it free of legislative control, it at the same time beckoned to the General Assembly to appropriate it under the guise of apportioning it; or to so use that authority that by stripping the constitutional court of all but a vestige of jurisdiction and placing the powers taken from it in tribunals of its own creation, to subvert the whole constitutional design and structure and replace it with one of its own devising. The indispensable requirement, which, if observed, accompanies the apportionment of jurisdiction with no offense to the constitutional intendment is that the legislatively ordained courts be inferior to a superior court. Manifestly a tribunal otherwise inferior but exercising a jurisdiction of causes equal to or greater than a superior court would violate the constitutional mandate. Just as the power in the General Assembly to ordain courts is limited to such as are inferior to a superior court, so, also is the authority to define the jurisdiction of those created in the exercise of it to such as is appropriate to the status, character and place in the judicature of such tribunals. These requirements, of course, are referable to the functions that such courts serve and the purposes that they are designed to achieve. The principal reason accounting for the establishment of inferior courts generally recognized is that of screening small causes from the court of general jurisdiction thereby preventing its dockets from becoming clogged with numerous proceedings of comparatively little importance and at the same time obviating the necessity of increasing the number of judges to

hear matters of such a character which could as well and with greater dispatch, under such conditions, be disposed of by a local tribunal. 21 C.J.S. § 51, p. 56."

Justice Hamersley in *Styles,* supra, 452, suggested with reference to the phrase "defined by law" that "it may well be that these words, as their form indicates, are simply a direction that the law shall at all times clearly define the limits of the powers and jurisdiction exercised by all courts; by those courts upon which jurisdiction may be conferred by the legislature in accordance with the jurisdiction so conferred, and by those courts whose jurisdiction is derived directly from the Constitution in accordance with the jurisdiction so granted."

Judge Cornell was of the opinion that the authority to define the "powers and jurisdiction of which courts" in § 1 of article fifth referred only to the inferior courts which the General Assembly was empowered to ordain. *Osborn* v. *Zoning Board,* supra, 526.

The problem of interpretation was settled definitively by the decision of this court in *Walkinshaw* v. *O'Brien,* supra, in which this court agreed unanimously that even without reference to the power to define powers and jurisdiction, "the power in the legislature to establish inferior courts necessarily involves the apportionment of jurisdiction between them and the Superior Court, for, as the jurisdiction of the latter is unlimited, any vesting of jurisdiction in any inferior court must necessarily take something from the jurisdiction the Superior Court would otherwise have had." Id., 135–36.

The test determinative of the constitutionality of a statute granting jurisdiction to a lower court is,

then, one of degree. "The power of the General Assembly to create 'inferiour [now, lower] courts' is not, however, unlimited. As we have said, the constitution adopted the Superior Court as an existing court with the essential characteristics it had previously possessed. *Styles* v. *Tyler,* supra, 450; *Dexter Yarn Co.* v. *American Fabrics Co.,* 102 Conn. 529, 538, 129 A. 527. Not only must any other court the General Assembly creates be an 'inferiour [lower] court' but it may not be so constituted as materially to detract from the essential characteristics of the Superior Court as it was then constituted." *Walkinshaw* v. *O'Brien,* supra, 140.

Since the constitution has designated the Superior Court and the Supreme Court as repositories of trial and appellate jurisdiction, the General Assembly cannot take from them in establishing lower courts what the constitution has itself bestowed. " 'It is entirely clear then that the legislature has not the competency to impair the essential nature or jurisdiction of any of the constitutional courts.' *Harris* v. *Vanderveer's Executor,* 21 N.J. Eq. 424, 427." *Walkinshaw* v. *O'Brien,* supra, 142.

In *Walkinshaw,* this court had for consideration the constitutionality of chapter 283 of the 1941 Supplement to the General Statutes, §§ 756f through 786f. This chapter created a new single state Court of Common Pleas for the entire state consisting of fourteen judges to replace existing county Courts of Common Pleas. It provided for criminal terms to be held in New Haven County at New Haven and in the judicial district of Waterbury, at Bridgeport, at New London and at Litchfield. § 760f. It provided for civil terms to be held at the same

places and, in addition, at Hartford, Middletown, Willimantic and Rockville. § 761f. Previously there had been a Court of Common Pleas in each of five of the counties and one in the judicial district of Waterbury. General Statutes, Cum. Sup. 1939, § 1371e. In general, these separate county courts had exclusive jurisdiction, in their respective counties or districts, of appeals from justices of the peace and from municipal courts when appeals from them were not required to be taken to the Supreme Court. General Statutes, Cum. Sup. 1939, § 1364e. They had exclusive jurisdiction of actions for legal relief wherein the matter in demand exceeded $100 but did not exceed $500, and of actions for equitable relief wherein the matter in demand did not exceed that sum. They had concurrent jurisdiction with the Superior Court of all actions claiming either legal or equitable relief wherein the matter in demand exceeded $500 but did not exceed $2000, with an additional concurrent jurisdiction with the Superior Court of actions for foreclosure of mortgages or liens regardless of the extent to which the matter in demand might exceed $2000. General Statutes, Cum. Sup. 1939, § 1396e. In criminal matters, the county Courts of Common Pleas had jurisdiction of appeals from justices of the peace or municipal courts in the counties or district for which they were created. General Statutes, Rev. 1930, § 6397.

The new state Court of Common Pleas was given exclusive jurisdiction of legal actions wherein the matter in demand exceeded $100 but did not exceed $2500, of equitable actions wherein the matter in demand did not exceed that sum, and of appeals from municipal boards, officers and commissions and from the liquor control commis-

sion and concurrent jurisdiction with the Superior Court of actions for the foreclosure of mortgages or liens wherein the matter in demand exceeded $2500. General Statutes, Sup. 1941, §§ 808f–810f. With reference to appeals from justices of the peace and municipal courts and criminal proceedings, it retained the jurisdiction which the former county Courts of Common Pleas had had, except that in civil cases appeals from justices of the peace and municipal courts were to be taken to the Court of Common Pleas in all counties whereas previously in any counties not having Courts of Common Pleas they were required to be taken to the Superior Court or Supreme Court. In 1941, when the Court of Common Pleas was created, the upper limit of criminal jurisdiction in a municipal court from which an appeal might be taken to the Court of Common Pleas was in a municipality having a population of 15,000 or more, and the limit of jurisdiction was over crimes and misdemeanors wherein the penalty provided did not exceed a fine of $500 or imprisonment for one year, or both. General Statutes, Sup. 1941, § 737f. There was a proviso that a municipal court could take jurisdiction of prosecutions for a crime the punishment for which should not exceed a fine of $1000, or imprisonment for not more than five years "whenever, upon conviction, the court shall determine that no greater punishment ought to be imposed than that which it may lawfully inflict." General Statutes, Cum. Sup. 1939, § 1457e; Sup. 1941, § 737f.

The question before the court in the *Walkinshaw* case, then, in brief, was whether it was within the constitutional power of the General Assembly to create a court which would sit throughout the state as one court having general civil jurisdiction in

cases wherein the demand did not exceed $2500, and on appeal in criminal cases wherein the penalty provided did not exceed a fine of $500 or imprisonment for one year, or both. Applying the test upon which the court unanimously agreed—whether the jurisdiction thus vested in the Court of Common Pleas materially detracted from the constitutional characteristics of the Superior Court—a majority of the court concluded that it did not, but added this important caveat and warning: "It must be recognized, however, that in the broad grant of jurisdiction to the Court of Common Pleas, summing up as it does the various extensions of jurisdiction which through the years have been made as regards the former Courts of Common Pleas, the General Assembly has trenched far upon the jurisdiction of the Superior Court as it existed when the constitution of 1818 became effective, and the question whether the act can be sustained is a very close one. Not without considerable hesitance have we concluded that by the terms of the act the status of the Superior Court as the trial court of general jurisdiction throughout the state and its essential characteristics have not been so impaired as to make the act unconstitutional." *Walkinshaw* v. *O'Brien,* supra, 144. In a sharp dissent, Justice, later Chief Justice, Brown disagreed with this conclusion of the majority. He wrote (pp. 149–50): "To sum up, between 1818 and 1941 the legislature by degrees, but none the less progressively and effectively, had been gradually depriving the Superior Court of jurisdiction. Then came the culminating act of 1941 unifying the cumulative encroachment of the past years and establishing another court of state-wide jurisdiction which duplicated the Superior Court. It had laden the proverbial camel's back with many straws

already. Finally, by its adoption of this act it added a whole bundle to top all the rest. It is my conclusion that this act violates the constitution, and that under it the Superior Court cannot 'continue with the essential characteristics it had previously possessed.' For this reason I have a deep and abiding conviction that now, once and for all, is the time to call a halt before it is too late. By this course only, in my judgment, can the continuance of the Superior Court with those characteristics which belonged to it at the adoption of the constitution be assured, and also the right of the individual to bring his action in a proper case to that court, which the constitution expressly and so wisely guarantees, be preserved."

Notwithstanding, or in disregard of the "considerable hesitance," admonition and caveat of the majority of this court in *Walkinshaw* v. *O'Brien,* supra, the General Assembly has continued to trench further and further upon the constitutional jurisdiction and the independence of the Superior Court. It is unnecessary to enumerate here these many encroachments, and we refrain from doing so. It suffices for the decision of the case presently before us to note that the upper limits of civil jurisdiction of $2500 provided in the 1941 act considered in *Walkinshaw* have since been raised by the General Assembly to $15,000; see General Statutes § 52-6; with jurisdiction concurrent with the Superior Court for cases where the matter in demand exceeds $7500 but does not exceed $15,000; see General Statutes § 52-28; and civil jurisdiction up to $7500 has been granted to the Circuit Court which was created as a state-wide court in 1959 by Public Act No. 28. See General Statutes § 52-2a. Criminal jurisdiction in the lower courts when *Walkinshaw*

was decided was limited to cases permitting a maximum fine of $500 or imprisonment for one year, or both. This was the limit of criminal jurisdiction granted to the Circuit Court when that court was established. This jurisdiction was increased by 1961 Public Act No. 352 to offenses punishable by a fine of not more than $1000 or imprisonment for not more than one year, or both. This jurisdiction limit continued until 1971 when by Public Act No. 870, § 1 (General Statutes § 54-1a), the jurisdiction of the Circuit Court was extended to crimes punishable by a fine of not more than $5000 or imprisonment for not more than five years, or both. It is specifically the constitutionality of this last and substantial extension of the criminal jurisdiction of the Circuit Court which is raised in the present appeal. The Superior Court concluded that insofar as § 54-1a of the General Statutes authorized the Circuit Court to impose a sentence in this case in excess of one year it is unconstitutional and invalid. In the light of the prior decisions of this court which we have discussed, and particularly of *Walkinshaw* v. *O'Brien*, supra, we conclude that the decision of the trial court on this issue was correct.

For reasons indigenous to the history and development of this state, and this country, and for the same, self-evident purposes for which the concept of separation of powers was originally implemented, the Connecticut constitution, which, less than a decade ago, was redrafted and ratified by the people in the context of three hundred years of self-government, continued the separate magistracies of a popularly elected executive and legislature and an independent judiciary. The constitution defines and circumscribes the powers of these three magistracies of government. As Chief Justice Marshall

observed in 1803: "To what purpose are powers limited, and to what purpose is that limitation committed to writing, if these limits may, at any time, be passed by those intended to be restrained?" *Marbury* v. *Madison,* 5 U.S. (1 Cranch) 137, 176, 2 L. Ed. 135. In enacting the statute today declared unconstitutional, the General Assembly acted in contravention of settled constitutional precedent and the judicial pronouncements of *Walkinshaw* v. *O'Brien,* supra, *Styles* v. *Tyler,* supra, and *Adams* v. *Rubinow,* 157 Conn. 150, 251 A.2d 49, relative to the division of jurisdiction between the legislative courts and the constitutional courts. The defendant has eloquently urged upon us the possibly deleterious repercussions of our decision, but we believe beyond a reasonable doubt that insofar as § 54-1a of the General Statutes extends the criminal jurisdiction of the Circuit Court to the imposition of penalties in excess of a fine of $1000 or confinement for more than one year, or both, it is unconstitutional.

There is error in part in the judgment of the Superior Court and the case is remanded to that court with direction to order that the plaintiff be discharged from custody arising from the sentence imposed by the Circuit Court unless within a reasonable time that court vacates the sentence which it imposed on the plaintiff and imposes a sentence which is within its constitutional jurisdiction to impose.

In this opinion SHAPIRO, LOISELLE and MACDONALD, Js., concurred.

BOGDANSKI, J. (concurring in part and dissenting in part). The trial judge must exercise a sound discretion in deciding whether to permit the withdrawal of a guilty plea. *State* v. *Brown,* 157 Conn.

492, 496, 255 A.2d 612. I would apply the principle recently adopted by the United States Supreme Court as an amendment to the federal Rules of Criminal Procedure,[1] and recommended by the American Bar Association[2] and the American Law Institute,[3] and hold that the trial judge exceeded

---

[1] See recently adopted Rule 11 (e) (4): "If the court rejects the plea agreement, the court shall inform the parties of this fact, advise the defendant personally in open court that the court is not bound by the plea agreement, afford the defendant the opportunity to then withdraw his plea, and advise the defendant that if he persists in his guilty plea or plea of nolo contendere the disposition of the case may be less favorable to the defendant than that contemplated by the plea agreement." 52 F.R.D. 415, 417, 429.

[2] See A.B.A. Standards Relating to the Function of the Trial Judge (Approved Draft, 1972) § 4.1 (c): "If the plea agreement contemplates the granting of charge or sentence concessions by the trial judge, he should: . . . (iii) permit withdrawal of the plea (or, if it has not yet been accepted, withdrawal of the tender of the plea) in any case in which the judge determines not to grant the charge or sentence concessions contemplated by the agreement." Four years earlier, the proposal was that the trial judge permit withdrawal of the plea whenever he had previously indicated that he would concur in the agreement but then changed his mind. A.B.A. Standards Relating to Pleas of Guilty (Approved Draft, 1968) § 2.1 (a) (ii) (5). The commentary to the A.B.A. Standards Relating to the Function of the Trial Judge (Approved Draft, 1972) states (p. 57): "[T]he standard recommended here by the Advisory Committee on the Judge's Function . . . mandates giving the defendant the opportunity to withdraw his plea whether or not the judge chooses to give advance notice as to his concurrence in the agreement. . . . [T]here is little difference, from the viewpoint of fair treatment, between cases where the judge gives advance notice of concurrence and those where he only follows the standards of requiring disclosure of the agreements and giving them due consideration. Even though the judge has said nothing to the defendant in the latter situation except that he need not follow the prosecutor's recommendations, there nevertheless remains at least the taint of false inducement."

[3] See A.L.I. Model Code of Pre-Arraignment Procedure (Tentative Draft No. 5, 1972) § 350.5 (4): "Before accepting a plea pursuant to a plea agreement, the court shall advise the parties whether it approves the agreement and will dispose of the case in accordance therewith. If the court determines to disapprove the agreement and

his discretion by refusing to permit the plaintiff to withdraw his bargained-for guilty plea when the judge had decided that he would not go along with the bargain. "The court in exercise of its discretion will permit one accused to substitute a plea of not guilty and have a trial if for any reason the granting of the privilege seems fair and just." *Kercheval* v. *United States,* 274 U.S. 220, 224, 47 S. Ct. 582, 71 L. Ed. 1009; *State* v. *Brown,* supra. "[W]hen a plea rests in any significant degree on a promise or agreement of the prosecutor, so that it can be said to be a part of the inducement or consideration, such promise must be fulfilled [if the plea is to be accepted]." *Santobello* v. *New York,* 404 U.S. 257, 262, 92 S. Ct. 495, 30 L. Ed. 2d 427. If the trial judge decides not to concur in the bargain, as is his prerogative, fundamental fairness to the accused requires him to permit the accused to bow out of his end of the deal.[4] *United States* v. *Gallington,* 488 F.2d 637, 640 (8th Cir.); *United States ex rel. Culbreath* v. *Rundle,* 466 F.2d 730, 735 (3d Cir.); see also *Ward* v. *United States,* 116 F.2d 135, 137 (6th Cir.); *Quintana* v. *Robinson,* 31 Conn. Sup. 22, 319 A.2d 515. As Mr. Justice Stewart said, concurring in *Dukes* v. *Warden,* 406 U.S. 250, 257–58,

---

not to dispose of the case in accordance therewith, it shall so inform the parties, not accept the defendant's plea of guilty or nolo contendere, and advise the defendant personally that he is not bound by the agreement."

[4] "If the judge were not to give the defendant this chance [to withdraw his plea], but instead held the defendant to his plea and refused to grant the concessions contemplated in the plea agreement, the defendant would probably believe that he had been dealt with unfairly. There are obvious reasons, from a correctional standpoint, why a defendant should be satisfied that he was treated fairly when he arrives at the penitentiary." A.B.A. Standards Relating to Pleas of Guilty (Approved Draft, 1968) § 3.3(b), Commentary at Sup. page 2.

92 S. Ct. 1551, 32 L. Ed. 2d 45: "If a defendant moves to withdraw a guilty plea before judgment and if he states a reason for doing so, I think that he need not shoulder a further burden of proving the 'merit' of his reason at that time. Before judgment, the courts should show solicitude for a defendant who wishes to undo a waiver of all the constitutional rights that surround the right to trial—perhaps the most devastating waiver possible under our Constitution. Any requirement that a defendant prove the 'merit' of his reason for undoing this waiver would confuse the obvious difference between the withdrawal of a guilty plea before the government has relied on the plea to its disadvantage, and a later challenge to such a plea, on appeal or collaterally, when the judgment is final and the government clearly has relied on the plea."

I concur in the holding of the majority opinion that General Statutes § 54-1a is pro tanto unconstitutional.